# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF COLORADO,  )
)
       *Petitioner*,  )
v.  )
)  No. 26-1059
UNITED STATES DEPARTMENT OF  )
ENERGY and CHRIS WRIGHT,  )
Administrator, United States Department of  )
Energy,  )
)
       *Respondents*.  )
)

## PETITION FOR REVIEW

Pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure,

D.C. Circuit Rule 15(a), and section 313(b) of the Federal Power Act, 16 U.S.C. §

825*l*(b), the State of Colorado, by and through the Colorado Office of the Attorney

General, hereby petitions the Court for review of the Order No. 202-25-14 of

Respondents, the United States Department of Energy and Secretary of Energy

Christopher Wright (collectively, "the Department of Energy"), issued on

December 30, 2025,  (the "Craig 1 Order"), attached as **Exhibit A**.

The prerequisites for judicial review of this petition have been met. On

behalf of the State of Colorado, the Colorado Attorney General participated in the

proceedings before the Department of Energy and timely filed a request for

1

rehearing of the Craig 1 Order, attached as **Exhibit B**, filed on January 28, 2026. The Department of Energy deemed that rehearing request denied by operation of law on March 2, 2026, pursuant to 16 U.S.C. § 825$l$(a). Therefore, the State of Colorado may file this petition for review under 16 U.S.C. § 825$l$(b). The State of Colorado's petition is filed within sixty days after the denial of rehearing.

This Court has jurisdiction, and venue in this Court is proper, under 16 U.S.C. § 825$l$(b).

The State of Colorado respectfully requests that this Court hold unlawful, vacate, and set aside the Craig 1 Order, and grant such further relief as may be deemed just and proper.

Respectfully submitted this 18th day of March 2026.

PHILIP J. WEISER
Attorney General

*/s/ Jessica L. Lowrey*
CARRIE NOTEBOOM, Colo. Bar #52910*
Assistant Deputy Attorney General
GABRIELLE FALCON, Colo. Bar #56739*
Assistant Attorney General
JESSICA L. LOWREY, Colo. Bar #45158*
First Assistant Attorney General
PHALEN KOHLRUSS-REUMAN,
Colo. Bar #57975*
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: 720-508-6000
E-mail: carrie.noteboom@coag.gov
gabby.falcon@coag.gov
jessica.lowrey@coag.gov
Phalen.Kohlruss@coag.gov

*Counsel of Record

# CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of March 2026, I electronically filed the foregoing **Petition for Review** and all exhibits with the Clerk of the Court using the Court's CM/ECF system.

I further certify that I have, on this 18th day of March 2026, caused copies of the foregoing to be served via certified priority mail, return receipt requested, upon the Department of Energy and Secretary Chris Wright at:

U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

I also caused copies to be sent via electronic mail to AskCR@hq.doe.gov and The.Secretary@hq.doe.gov.

I have also caused service copies of the foregoing on all parties to the

proceeding before the Department of Energy via electronic mail at the following

addresses:

Michelle S. Kallen
David Marcou
Alexander Langer
Micaela Hyams
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
mkallen@steptoe.com
dmarcou@steptoe.com
alanger@steptoe.com
mhyams@steptoe.com
Tel: (202) 429-3000
Fax: (202) 429-3902
*Counsel for Tri-State Generation and
Transmission Association, Inc.*

Jennifer Hammitt,
Director of Legal Affairs
Sarah Leonard,
General Counsel
2000 E. Horsetooth Road
Fort Collins, CO 80526
hammittj@prpa.org
leonards@prpa.org
Tel: (970) 226-4000
*Counsel for Platte River
Power Authority*

Leslie Coleman
Michael Hiatt
1125 17th Street, Suite 1010
Denver, CO 80202
mhiatt@earthjustice.org
lcoleman@earthjustice.org
*Counsel for GreenLatinos,
Vote Solar, and Public Citizen
Salt River Project*

Matt Gerhart
Sierra Club Environmental Law
Program
1536 Wynkoop St., Suite 200
Denver, CO 80202
matt.gerhart@sierraclub.org
*Counsel for Sierra Club*

Gregory E. Wannier
Sierra Club Environmental Law
Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
*Counsel for Sierra Club*

Robert Rignonan
311 S. Wacker Dr., Suite 1400
Chicago, IL 60616
rrigonan@earthjustice.org
*Counsel for GreenLatinos,*
*Vote Solar, and Public Citizen*
*Salt River Project*

Ted Kelly
Tomás Carbonell
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org
*Counsel for Environmental Defense*
*Fund*

Michael Lenoff
1400 L St NW, Lobby 2, Unit 34117
Washington, DC 20005
(202) 660-0519
mlenoff@earthjustice.org
*Counsel for GreenLatinos,*
*Vote Solar, and Public Citizen*
*Salt River Project*

John Daniel Skees
Stephen M. Spina
Patrick R. Pennella
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
(202) 739-5834/5958/5062
daniel.skees@morganlewis.com
stephen.spina@morganlewis.com  p
atrick.pennella@morganlewis.com
*Counsel for Public Service*
*Company of Colorado*

Timothy T. Mastrogiacomo
Vice President, Federal Regulatory,
Legal, and Policy
Xcel Energy Services, Inc.
701 Pennsylvania Ave. NW, Suite 250
Washington, DC 20006
(202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com
*Counsel for Public Service Company of*
*Colorado*

Joseph W. Lowell
Assistant General Counsel
Xcel Energy Services Inc.
701 Pennsylvania Ave. NW,
Suite 250
Washington, DC 20004
(303) 571-6428
joe.w.lowell@xcelenergy.com
*Counsel for Public Service*
*Company of Colorado*

Lastly, I served a courtesy copy by email on the following entities:

Salt River Project
Michael.OConnor@srpnet.com

PacifiCorp
marie.durrant@pacificorp.com

Western Area Power Administration (WAPA)
SOCChiefComplianceOffice@wapa.gov
Klinefelter@wapa.gov

Rocky Mountain Region and Southwest Power Pool (SPP) West
psuskie@spp.org
tkentner@spp.org
cnolen@spp.org

Earth Justice
jyun@earthjustice.org
lperfetto@earthjustice.org

/s/ Jessica L. Lowrey
Jessica L. Lowrey

# EXHIBIT A



## Order No. 202-25-14

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA),[1] and section 301(b) of the Department of Energy Organization Act,[2] and for the reasons set forth below, I hereby determine that an emergency exists within the Western Electricity Coordinating Council (WECC) Northwest assessment area due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes, and that issuance of this Order will meet the emergency and serve the public interest.

### *BACKGROUND*

Craig Station (Craig) is an electric generating facility in Craig, Colorado. Craig is operated by the Tri-State Generation and Transmission Association (Tri-State). Craig consists of three coal-fired generation units, Unit 1 (446.4 MW), Unit 2 (446.4 MW), and Unit 3 (534.8 MW), with a combined name plate capacity of 1427.6 MW.[3] Unit 1 and Unit 2 are co-owned by Tri-State, Platte River Power Authority, Salt River Project, PacifiCorp, and Xcel Energy (co-owners).[4] Unit 3 is wholly owned by Tri-State. Unit 1 and Unit 2 began operations in 1980 and 1979 respectively. Unit 3 began operations in 1984. Unit 1 is slated to cease operations in December 2025. Unit 2 and Unit 3 are slated to retire in 2028.[5]

### *EMERGENCY SITUATION*

In its 2024 Long-Term Reliability Assessment (LTRA), the North American Electric Reliability Corporation (NERC) notes that in the WECC Northwest assessment area, which includes Colorado, Idaho, Montana, Oregon, Utah, Washington, and Wyoming, "[e]nergy variability is greater in the Northwest than other WECC regions due to the large share of wind and hydro in the portfolio." The LTRA notes that:

> [f]ive [gigawatts] of baseload resource retirements are anticipated between 2024 and 2028. The energy needs are to be replaced by solar, wind, and [battery energy storage systems], further increasing variability in the portfolio. Given the retiring of baseload resources, supply chain issues preventing the construction of [battery energy storage systems] resources are a concern as they assist in meeting demand

---

[1] 16 U.S.C. § 824a(c).

[2] 42 U.S.C. § 7151(b).

[3] U.S. Energy Information Administration, Form EIA-860, Schedule 3: Generator Data (2024), https://www.eia.gov/electricity/data/eia860/.

[4] Platte River Power Authority, Craig Units 1 & 2 (Yampa Project), https://prpa.org/generation/yampa-project/.

[5] As a coal-fired facility, it would be difficult for the Craig Unit 1 to resume operations once it has been retired. Specifically, any stop and start of operation creates heating and cooling cycles that could cause an immediate failure that could take 30-60 days to repair if a unit comes offline. In addition, other practical issues, such as employment, contracts, and permits may greatly increase the timeline for resumption of operations. Further, if Tri-State and co-owners were to begin disassembling the plant or other related facilities, the associated challenges would be greatly exacerbated. Thus, continuous operation is required in such cases so long as the Secretary determines a shortage exists and is likely to persist.

during shoulder periods where solar availability is dropping but loads remain high.[6]

The 2024 WECC Western Assessment of Resource Adequacy notes that peak demand in WECC's Northwest-Central subregion, which includes Colorado, is "forecast to grow by 8.5% over the next decade, from 33 GW in 2025 to 36 GW in 2034."[7] Meanwhile, WECC notes that most planned retirements are "baseload generation, such as coal, natural gas, and nuclear."[8]

Since 2019, 571.3 MW of coal-fired generating capacity across six units at three locations have retired in Colorado,[9] leading to a decline in the share of coal-generated electricity from 45% to 28%.[10] Looking forward, by 2029, about 3,700 megawatts of coal-fired generating capacity in Colorado is scheduled to retire according to the Energy Information Administration (EIA),[11] accounting for all but one coal-fired power plant in Colorado. In that same time frame, 675.6 MW of natural gas-fired generating capacity in Colorado will retire as well.[12] In 2025, intermittent wind accounted for over 5,300 MW of Colorado's electricity generating capacity.[13]

Executive orders issued by President Donald J. Trump on January 20, 2025 and April 8, 2025 underscored the dire energy challenges facing the Nation due to growing resource adequacy concerns. President Trump declared a national energy emergency in Executive Order 14156, "Declaring a National Energy Emergency," in which he determined that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[14] The Executive Order adds: "Hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."[15] In a subsequent Executive Order 14262, "Strengthening the Reliability and Security of the United States Electric Grid," President Trump emphasized that "the United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion

---

[6] *NERC 2024 Long-Term Reliability* Assessment, at 130 (Dec. 2024, corrected Jul. 11, 2025), https://www.nerc.com/globalassets/ourwork/assessments/2024-ltra_corrected_july_2025.pdf.

[7] Western Electricity Coordinating Council, *Western Assessment of Resource Adequacy 2024: Peak Demand by Subregion*, at 2, https://www.wecc.org/sites/default/files/documents/products/2024/WARA%202024%20Peak%20Demand%20by%20Subregion.pdf.

[8] Western Electricity Coordinating Council, *Western Assessment of Resource Adequacy*, https://feature.wecc.org/wara/.

[9] *Id.*

[10] U.S. Energy Information Administration, *Electricity Data Browser, Net Generation for All Sectors Annually from 2019-2024, State: Colorado, (last accessed Dec. 30, 2025),* https://www.eia.gov/electricity/data/browser/#/topic/0?agg=2,0,1&fuel=vtvp&geo=0000000000g&sec=g&freq=A&start=2019&end=2024&ctype=linechart&ltype=pin&rtype=s&pin=&rse=0&maptype=0.

[11] U.S. Energy Information Administration, *Preliminary Monthly Electric Generator Inventory (based on Form EIA-860M as a supplement to Form EIA-860), Inventory of Operating Generator as of November 2025, Plant State: Colorado, Technology: Conventional Steam Coal* (Nov. 2025), https://www.eia.gov/electricity/data/eia860m/.

[12] U.S. Energy Information Administration, *Preliminary Monthly Electric Generator Inventory (based on Form EIA-860M as a supplement to Form EIA-860), Inventory of Operating Generator as of November 2025, Plant State: Colorado, Technology: Natural Gas Fired Combustion Turbine and Natural Gas Stream Turbine* (Nov. 2025), https://www.eia.gov/electricity/data/eia860m/.

[13] U.S. Energy Information Administration, *Preliminary Monthly Electric Generator Inventory (based on Form EIA-860M as a supplement to Form EIA-860), Inventory of Operating Generator as of November 2025, Plant State: Colorado, Technology: Onshore Wind Turbine* (Nov. 2025), https://www.eia.gov/electricity/data/eia860m/.

[14] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (*Declaring a National Energy Emergency*), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[15] *Id.*

of artificial intelligence data centers and increase in domestic manufacturing."[16]

Further, the Department detailed the myriad challenges affecting the Nation's energy systems in its July 2025 "Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid," issued pursuant to the President's directive in Executive Order 14262. The Department concluded that "[a]bsent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation."[17]

## *ORDER*

FPA section 202(c)(1) provides that whenever the Secretary of Energy determines "that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy," then the Secretary has the authority "to require by order . . . such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest."[18] This statutory language constitutes a specific grant of authority to the Secretary to require the continued operation of Craig Unit 1 when the Secretary has determined that such continued operation will best meet an emergency caused by a sudden increase in the demand for electric energy or a shortage of generation capacity.

Such is the case here. As described above, the emergency conditions resulting from increasing demand and shortage from accelerated retirement of generation facilities will continue in the near term and are also likely to continue in subsequent years. This could lead to the loss of power to homes, and businesses in the areas that may be affected by curtailments or power outages, presenting a risk to public health and safety.

I have made the determination that, to best meet the emergency arising from increased demand, determined shortage, and other causes, and serve the public interest under FPA section 202(c), Craig Unit 1 shall be made available for operation until March 30, 2026.

Based on my determination of an emergency set forth above, I hereby order:

A. From December 30, 2025, Tri-State and the co-owners, shall take all measures necessary to ensure that Craig Unit 1 is available to operate at the direction of either Western Area Power Administration (WAPA)—Rocky Mountain Region Western Area Colorado Missouri (WACM) in its role as Balancing Authority or the Southwest Power Pool (SPP) West in its role as the Reliability Coordinator, as applicable.[19] Following the conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry

---

[16] Executive Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025) (*Strengthening the Reliability and Security of the United States Electric Grid*), https://www.federalregister.gov/documents/2025/04/14/2025-06381/strengthening-the-reliability-and-security-of-the-united-states-electric-grid.

[17] U.S. Department of Energy, *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid*, at 1 (Jul. 2025), https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%2 0Report%20%28FINAL%20JULY%207%29.pdf.

[18] Although the text of FPA section 202(c) grants this authority to "the Commission," section 301(b) of the Department of Energy Organization Act transferred this authority to the Secretary of the Department of Energy. *See* 42 U.S.C. § 7151(b).

[19] U.S. Energy Information Administration, Form EIA-860, Schedule 3: Plant Data (2024), https://www.eia.gov/electricity/data/eia860/.

practices.

B. To minimize adverse environmental impacts, this Order limits operation of Craig Unit 1 to the times and within the parameters established in paragraph A. Tri-State shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether Craig Unit 1 has operated in compliance with this Order.

C. All operations of Craig Unit 1 must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D. By January 20, 2026, Tri-State, in coordination with the co-owners, is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of Craig Unit 1 consistent with this Order. Tri-State and the co-owners shall also provide such additional information regarding the environmental and operational impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E. Tri-state and the co-owners are directed to file with the Federal Energy Regulatory Commission Tariff revisions or waivers to effectuate this Order, as needed. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F. This Order shall not preclude the need for Craig Unit 1 to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

G. Because this Order is predicated on the shortage of facilities for generation of electric energy and other causes, Craig Unit 1 shall not be considered a capacity resource.

H. This Order shall be effective from 11:59 PM Eastern Standard Time (EST) on December 30, 2025, and shall expire at 11:59 PM Eastern Daylight Time (EDT) on March 30, 2026, with the exception of applicable compliance obligations in paragraph D.

Issued in Washington, D.C. at <u>7:08PM</u> EST on this 30th day of December 2025.


_Chris Wright_

Chris Wright
Secretary of Energy

cc:    **<u>FERC Commissioners</u>**
Chairman Laura V. Swett
Commissioner David Rosner
Commissioner Lindsay S. See
Commissioner Judy W. Chang
Commissioner David A. LaCerte

**<u>Colorado Public Utilities Commission</u>**
Chairman Eric Blank
Commissioner Megan Gilman
Commissioner Tom Plant

# EXHIBIT B

UNITED STATES OF AMERICA

BEFORE THE

UNITED STATES DEPARTMENT OF ENERGY

_____

|                                        |     |                        |
| Federal Power Act Section 202(c)        |  )  |  Order No. 202-25-14   |
| Emergency Order: Craig Unit 1           |  )  |                        |

_____

The State Of Colorado's Request for Rehearing,
Motion to Intervene, and Stay Request

_____

i

Table of Contents

I.      Introduction                                                                    1

II.     Motion To Intervene                                                             3

III.    Background                                                                      5

   A.   Craig Unit 1 is owned by several utilities with specific service areas. ............5

   B.   The Craig Unit 1 Owners decided to retire Craig Unit 1 ten years ago and
        included the retirement in their resource plans. .....................................7

   C.   Federal Energy Regulatory Commission ("FERC") and its designated entities also
        oversee resource planning decisions for Craig Station to ensure reliability. ... 10

   D.   The Craig Order is in line with other federal efforts to support the coal
        industry. ..................................................................... 15

IV.     Statement Of Issues and Specifications of Error                                 17

V.      Request For Rehearing                                                           19

   A.   The Order is contrary to law because it improperly expands the use of Section
        202(c)'s emergency authority beyond the limited scope set forth in the FPA.  19

      i.   The language, history and structure of Section 202(c) limit the Department to
           addressing specific, imminent, unexpected and temporary supply shortfalls. 20

      ii.  Section 215 of the FPA explicitly assigns federal regulation of long term
           resource adequacy to FERC, further emphasizing that the Department's
           Section 202(c) authority is limited to imminent emergencies. .................. 23

      iii. The Order is arbitrary, capricious and contrary to law because it contradicts
           the Department's regulations interpreting Section 202(c) and its historic
           practice in applying Section 202(c). ............................................ 26

      iv.  Courts have found that the Department's use of Section 202(c) is limited to
           true emergencies and the Department is bound by the courts' statutory
           interpretation. ................................................................ 29

   B.   Section 202(c) does not vest the Department with general regulatory authority
        over resource adequacy, which is regulated by the states and FERC under other
        provisions of the FPA. ............................................................ 32

   C.   The Order fails to present substantial evidence for its emergency determination
        and ignores critical facts. ....................................................... 37

      i.   NERC's assessments do not establish that there is an energy emergency in the
           areas served by Craig Unit 1. .................................................. 38

      ii.  WECC's Western Assessment of Resource Adequacy and the Department's
           Resource Adequacy Report do not demonstrate an emergency. ................ 45

  iii. State planning processes have assured that the areas served by Craig Unit 1 have sufficient capacity currently and will continue to have sufficient capacity without Craig Unit 1.................................................................. 48

  iv. The Executive Orders cited in the Order are not evidence of an energy emergency. ............................................................................. 61

 D. The Order is arbitrary and capricious because it fails to require generation that best meets the claimed emergency................................................ 65

  i. Preventing Craig Unit 1's retirement does not "meet the emergency," especially where the unit requires costly repairs.................................. 65

  ii. Delaying the retirement of Craig Unit 1 does not "best" meet the Department's purported emergency.............................................. 67

 E. The Order's terms fail to comply with Section 202(c)'s requirements. ......... 73

  i. The Order is contrary to law because it attempts to regulate a generation facility by requiring the Craig Unit 1 Owners to undertake substantial and expensive repairs that they otherwise would not conduct. ...................... 73

  ii. The Order violates Section 202(c)(2) because it fails to ensure consistency with federal and state environmental laws and fails to minimize adverse environmental impacts. ......................................................... 75

 F. The Order is designed to support the federal administration's policy goal of propping up the coal industry, making it an arbitrary and capricious pretext. 83

  i. The Department's 2025 Section 202(c) orders demonstrate a pattern of arbitrary and capricious behavior designed to carry out a policy goal. ........ 83

  ii. Despite claims it is addressing energy emergencies, the Department is simultaneously interfering with efforts to increase generation through renewable resources. ............................................................... 85

 G. The Department failed to comply with NEPA....................................... 87

VI. Request For Stay 89

 A. Colorado and its people will suffer irreparable injury absent a stay. ........... 90

 B. A stay is in the public interest..................................................... 91

VII. Conclusion 91

Certificate of Service 93

State of Colorado's Exhibit List 94

### I.  Introduction

On December 30, 2025, the Department of Energy ("Department") issued Order No. 202-25-14 ("Order")[1] pursuant to its emergency authority under Section 202(c) of the Federal Power Act ("FPA")[2] ("Section 202(c)") to prevent the scheduled retirement of a coal-fired generating unit at the Craig Power Station in Moffat County, Colorado. The Order requires the availability of one coal-fired unit ("Craig Unit 1") from December 30, 2025, to March 30, 2026.

There is no emergency justifying the Department's Order, and even if there were, preventing the retirement of Craig Unit 1 is not the best (or even a reasonable) way to meet the alleged emergency, and does not serve the public interest. The FPA limits the use of Section 202(c) to addressing specific, imminent capacity shortfalls resulting from unexpected outages, natural disasters, extreme weather, and similar circumstances. Here, the Department has declared an emergency due to "a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes" in the Western Electricity Coordinating Council ("WECC") Northwest assessment area.[3] But the Order's emergency determination cannot stand against even the mildest scrutiny.

There is no energy "emergency" as defined by Section 202(c) in the WECC-Northwest assessment area, in Colorado, or in any of the states served by Craig Unit 1. Rather, the Unit's owners and their respective state utility commissions have been

---

[1] Exhibit A (Department, Order No. 202-25-14 (Dec. 30, 2025) ("Order")).
[2] 16 U.S.C. § 824a(c).
[3] Exhibit A, at 1.

planning for Craig Unit 1's retirement for the last decade.[4] These comprehensive planning processes have ensured that there are reliable and affordable resources available to meet the energy needs in the areas served by Craig Unit 1, such that its long-planned retirement does not create an emergency.

The Department's illegal use of its Section 202(c) authority to require the continued availability of Craig Unit 1, unsupported by any evidence of an imminent energy emergency, will result in unnecessary operational and maintenance costs that could be imposed on ratepayers in Colorado and potentially other states. Continued operation of Craig Unit 1 pursuant to the Order would also cause needless pollution emitted into Colorado and its neighboring states, which the Department failed to meaningfully consider or address, as it was required to do. The Order illegally intrudes on the authority of the states to ensure the resource adequacy of their electric grids and to dictate energy policy within their borders, and improperly attempts to impose the administration's policy preferences on state ratepayers.

Pursuant to Section 313*l* of the FPA,[5] the Colorado Attorney General, on behalf of the State of Colorado, timely submits this request for rehearing and motion to intervene ("Request") seeking rehearing of the Order. The Department should grant rehearing and rescind the Order because it is an unlawful abuse of the Department's emergency authority, is unsupported by evidence showing a true emergency, and is arbitrary and capricious.

---

[4] Exhibit C (Declaration of Erin O'Neil (Jan. 26, 2026), ¶ 32.
[5] 16 U.S.C. § 825*l*.

## II.    <u>Motion To Intervene</u>

The State of Colorado moves to intervene in the proceeding initiated by the Order and become a party for purposes of Section 313*l* of the FPA.[6] The State of Colorado is aggrieved by the Order in several ways.

First, households and businesses in Colorado could be required to pay higher electricity bills because of the Order.[7] Through a carefully planned process driven by economic considerations, the owners of Craig Unit 1 planned to retire the Unit and replace it with more cost-effective facilities.[8] By ordering the continued operation of Craig Unit 1, the Order guarantees that Tri-State Generation and Transmission Association, Inc. ("Tri-State"), PacifiCorp, Platte River Power Authority ("PRPA"), Salt River Project, and Public Service Company of Colorado ("Public Service") (together, "Craig Unit 1 Owners"), will incur higher costs to serve their members and customers, which they will then likely seek to pass on to their electricity consumers, including rural customers in Colorado.[9] Although the precise costs and the cost recovery methods are not yet known, it is likely that Colorado ratepayers will bear substantial new costs above what they would have paid absent the Order.[10]

---

[6] 16 U.S.C. § 825l.

[7] Exhibit D (Declaration of Joseph Pereira (Jan. 26, 2026)). Because the Order directs the Craig Unit 1 Owners to seek cost recovery the possibility of increased rates is a foreseeable harm for Colorado. Exhibit A, ¶ E. However, Colorado reserves all rights to dispute that costs incurred based on the Order are appropriate.

[8] Tri-State, *Reliable, Lowest-Cost, Reduced Emissions Preferred Portfolio Focus of Tri-State Resource Plan Filing* (Apr. 11, 2025) (last visited Jan. 26, 2026).

[9] Exhibit D, ¶ 11, 18.

[10] Exhibit D.

Second, the Craig Unit 1 Owners determined that it is prudent to retire Craig Unit 1 and replace it with more reliable and cost-effective resources. And the Colorado Public Utilities Commission ("CoPUC") determined that retiring Craig Unit 1 will not affect Tri-State's resource adequacy.[11] By delaying the retirement of a 45 year old coal-fired unit that was not even operable at the time the Order was issued, the Department is causing Colorado's electric customers to be served by a more costly and less reliable and resilient electric grid. Instead of continuing to invest and develop more reliable resources as planned, the Craig Unit 1 Owners will have to dedicate resources to repair and maintain a coal plant that is less reliable and more costly than other generation resources.

Third, Colorado will suffer environmental harms if Craig Unit 1 is required to operate based on the Order. Craig Unit 1 is a significant source of particulate matter ("PM"), nitrogen oxides ("NOx"), sulfur dioxide ("SOx"), carbon monoxide ("CO"), mercury, hazardous air pollutants (HAPs), and greenhouse gas ("GHG") emissions, and its scheduled retirement would have resulted in significant emissions reductions.[12] The Order does not make a meaningful attempt to minimize or mitigate the emissions impact of continued operation of Craig Unit 1 as required. Operating Craig Unit 1 beyond its planned retirement date will increase the amount of pollution emitted in Colorado, harming the environment, public health, and welfare, as well as Colorado's ability to comply with other federal and state environmental laws.[13]

---

[11] *See e.g.*, Exhibit E (CoPUC, Decision No. C25-0612, issued on August 26, 2025, in Proceeding No. 23A-0585E), at ¶ 116; CoPUC, Decision No. R22-0191, issued on March 28, 2022, in Proceeding No. 20A-0528E.
[12] Exhibit B, ¶¶ 13-18.
[13] *See* generally, *infra*; Exhibit B, at 15-22.

Finally, state authority over generation resources has been a bedrock principle of the FPA for nearly a century. Federal intrusion in this traditional sphere of state control is permitted only in a true emergency and only with specific procedures that the Department did not follow when issuing the Order. Colorado's sovereign interest in seeing its state laws followed in an area reserved to state sovereign authority further warrants the State's intervention.

### III.    Background

The Order makes several claims about Colorado's energy resource mix, expected increases in energy demand in the region, and the resulting need for continued availability of Craig Unit 1 to address an alleged energy emergency. The facts on the ground tell a very different story.

**A.    Craig Unit 1 is owned by several utilities with specific service areas.**

Craig Unit 1, along with Craig Units 2 and 3, comprise Craig Station, a 1,285 megawatt ("MW"), generating facility in Moffat County, CO.[14] Craig Units 1 and 2, also known as the Yampa Project, are operated solely by Tri-State but are co-owned by Craig Unit 1 Owners. Craig Unit 1 has a 427 MW capacity and began operating in 1980, making it over 45 years old.[15] Craig Unit 1 was approved to retire on December 31, 2025. Craig Unit 2, which has a 410 MW capacity, has an approved retirement date of September 30, 2028, and Craig Unit 3, which is solely owned and operated by Tri-

---

[14] *Craig Station Unit 2 owners announce retirement date of Sept. 30, 2028,* Tri-State (July 8, 2020), (last visited Jan. 26, 2026); Exhibit F (CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Brad Nebergall, filed on December 1, 2020, in Proceeding no. 20A-0528E, Attachment BN-2, (Tri-State, 2020 IRP/ERP, Public (Dec. 1, 2020)), at 182.

[15] Global Energy Monitor, a project of the Sierra Club, *Craig Station* (last updated Jan. 5, 2026) (last visited Jan. 26, 2026); Exhibit F, at 182.

State and has a 448 MW capacity, will retire by 2030. [16] It is Colorado's understanding that, when operating, Craig Unit 1 primarily provides energy to Colorado, as 51% of the unit is owned by Colorado utilities and it is located in Colorado, but provides some energy to Wyoming and Utah, and indirectly to Arizona.

Tri-State is a wholesale electric generation and transmission cooperative association with members located across Colorado, Nebraska, New Mexico, and Wyoming. Tri-State is a non-profit corporation and is owned and governed by its members through a Board of Directors.[17] Tri-State's board is responsible for approving rates, major capital investments, and resource planning decisions.[18] These resource planning decisions must then be approved by the CoPUC. Tri-State's ownership share of Craig Unit 1 is 24%, and Tri-State therefore is entitled to 102.5 MW out of Craig Unit 1's 427 MW capacity.[19] It is Colorado's understanding that within Tri-State's service territory, only Colorado and Wyoming receive energy from Craig Unit 1.

PRPA and Public Service are the two other Colorado-based utilities with an ownership stake in Craig Unit 1. PRPA is a non-profit community-owned power generation and transmission utility that provides energy to Estes Park, Fort Collins, Longmont, and Loveland, Colorado.[20] PRPA has an 18% ownership share of Craig Unit 1

---

[16]Tri-State, *Craig Station Unit 2 Retirement* (July 8, 2020); Exhibit F, at 182; Exhibit G (CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Brad Nebergall, filed on December 1, 2020, in Proceeding No. 20A-0528E, Attachment BN-1 (Tri-State, Responsible Energy Plan ("Responsible Energy Plan") (Jan. 2020)), at 3.

[17] Exhibit JJ (CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Brad Nebergall, filed on December 1, 2020, in Proceeding No. 20A-0528E, Proceeding 20A-0528E), at 13:8-13.

[18] *Id.*, at 13:16-22.

[19] Exhibit J (CoPUC, 120 Day ERP Implementation Report, Public, filed on April 11, 2025, in Proceeding No. 23A-0585E).

[20] Exhibit EE (PRPA, *2024 Integrated Resource Plan* (Apr. 2023)).

and therefore is entitled to 77 MW of Craig Unit 1's capacity.[21] Public Service is a subsidiary of Xcel Energy, Inc., and is the largest gas and electric provider in Colorado. However, Public Service has the smallest ownership stake in Craig Unit 1, owning 9% (38.4 MW of the unit's total capacity).[22]

The Salt River Project and PacifiCorp are the two non-Colorado owners of Craig Unit 1. The Salt River Project is a non-profit organization that provides power in central Arizona.[23] The Salt River Project owns 29% of Craig Unit 1 (124 MW of the unit's total capacity).[24] However, the Salt River Project does not receive energy from Craig Unit 1 directly and instead trades for it through the Western Area Power Administration ("WAPA"). Their contract for exchanging this power through WAPA will expire on April 1, 2026. PacifiCorp is based in Oregon but serves customers in Oregon, Washington, California, Utah, Idaho, and Wyoming. PacifiCorp has a 19% ownership of Craig Unit 1 (81 MW of the unit's total capacity). It is Colorado's understanding that within PacifiCorp's service territory, only Utah and Wyoming receive energy from Craig Unit 1.

**B.    The Craig Unit 1 Owners decided to retire Craig Unit 1 ten years ago and included the retirement in their resource plans.**

In 2016, the Craig Unit 1 Owners voluntarily decided to retire Craig Unit 1 by December 31, 2025, based on "the state and federal regulatory environment for coal-based generation, current and forecasted market conditions, the significant costs to

---

[21] Exhibit FF (PRPA, *Craig Units 1&2 (Yampa Project)* (2026)).
[22] *Craig Station*, Global Energy Monitor.
[23] Exhibit H (Salt River Project, *2023 Integrated Systems Plan*) at 6.
[24] *Id.*, at 27.

install additional emissions controls, and the best interests of electric consumers."[25] The Craig Unit 1 Owners agreed to proposed revisions to Air Quality Control Commission Regulation No. 23 and Colorado's Regional Haze State Implementation Plan ("SIP") that included the December 31, 2025 retirement date.[26] The U.S. Environmental Protection Agency ("EPA") approved Craig Unit 1's retirement date on July 5, 2018.[27] Since 2016, the Craig Unit 1 Owners have incorporated the planned closure of the unit as an assumption in all ERP proceedings, reports, decisions and modeling.[28] None of these processes or reports conclude that resource adequacy or reliability would be threatened by the unit's retirement.

Tri-States' resource plans are overseen by the CoPUC. The CoPUC reviewed Tri-State's load forecasts, resource needs, and planned resource acquisitions, all of which included the retirement of Craig Unit 1 by December 31, 2025 as an underlying assumption, as part of Tri-State's 2020 ERP and most recently its 2023 ERP for planning years 2026-2031.[29] As recently as August 2025, the CoPUC found that "Craig Unit 1 is not required for reliability or resource adequacy purposes based on the record in this ERP. Every portfolio that Tri-State modeled for its most recent ERP

---

[25] Tri-State, *Craig Station Owners, Regulators and Environmental Groups Reach Agreement on Proposed Revisions to Colorado Regional Haze Plan* (Sept. 1, 2016).
[26] *See id.*; 5 Colo. Code Reg. § 1001-27, Part A, Section IV.D.1 (2025).
[27] Air Plan Partial Approval and Partial Disapproval; Colorado; Regional Haze Plan for the Second Implementation Period, 83 Fed. Reg. 31,332 (July 5, 2018).
[28] Tri-State, *Craig Station Owners Agreement*; *e.g.*, CoPUC, *Tri-State, ERP Annual Progress Report, Revised*, filed on June 2, 2017, in Proceeding No. 15M-0852E, at 16; CoPUC, ERP for Annual Progress Report, filed on October 31, 2018, in Proceeding No. 15M-0852E, at 17; CoPUC, ERP Annual Progress Report, filed on December 10, 2019, in Proceeding No. 15M-0852E, at 22.
[29] Exhibit F, at 31; CoPUC, 150-Day Report, Public, filed on February 13, 2023, in Proceeding No. 20A-0528E, at 28; Exhibit X (CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Lisa K. Tiffin, Rev. 1, filed on May 15, 2024, in Proceeding No. 23A-0585E, Attachment LKT-1 (Tri-State, 2023 ERP Phase I, Rev. 2 (Apr. 22, 2024)), at 19, 21, 32, 44, 55, 66; Exhibit J, at 21, 32, 43, 54, 64, 75.

assumes that Craig Unit 1 retires at the end of 2025. . . every portfolio meets all reliability metrics and is reliable." The CoPUC further found that Tri-State's resource plan—including the retirement of Craig Unit 1—is resource diverse and cost effective, ensuring energy security, economic prosperity, and environmental protection. And the ERP progress report filed by Tri-State on December 1, 2025, did not present any resource adequacy or reliability issues, and continues to project no capacity shortfalls through 2035. Tri-State reaffirmed on January 23rd that the Craig Unit 1 retirement "has informed operational and maintenance decisions, and Tri-State has planned for adequate resources to maintain reliability on its system following the unit's retirement."[30] Public Service, which also engages in the ERP process with the CoPUC for review of its resource adequacy and reliability, has not indicated in its CoPUC filings a need for energy from Craig Unit 1 to meet any immediate or longer-term resource needs. Neither has PRPA, which conducts its own integrated resource planning process.

The other Craig Unit 1 Owners are subject to similar oversight by their state utility commissions, and since Tri-State's service territory also includes Wyoming, its extensive planning addresses resource adequacy there as well. As part of their respective state-approved resource plans, Salt River Project and PacifiCorp have confirmed there are no resource adequacy concerns in their respective states associated with the retirement of Craig Unit 1.

---

[30] Tri-State, *Tri-State makes Craig Generating Station Unit 1 available to operate in compliance with DOE emergency order* (Jan. 23, 2026).

Underscoring the lack of need for Craig Unit 1, the unit suffered an outage on December 19, 2025 due to a mechanical failure of a valve.[31] Absent the Order, it is unlikely the Owners would have expended new resources to repair the aging unit given that they were not expecting to use it to generate energy after December 31st.

**C.    Federal Energy Regulatory Commission ("FERC") and its designated entities also oversee resource planning decisions for Craig Station to ensure reliability.**

The structure of FERC's management of the bulk power system is important to understand various studies and reports as they relate to the claimed emergency identified in the Order. The Craig Unit 1 Owners are currently not part of a Regional Transmission Organization ("RTO") or Independent System Operator ("ISO"). The reliability and resource adequacy of the electric power system in states that are not in RTOs or ISOs are typically managed by individual utilities, which are often vertically integrated, meaning they handle generation, transmission, and distribution of electricity within their service areas, and are typically overseen by state public utilities commissions or a similar state entity.[32] Although the utilities served by Craig Unit 1 are not in an RTO or ISO, they are subject to reliability oversight by FERC and several balancing authorities, in addition to being managed by their state resource planning and reliability requirements. These related processes are designed to govern long-term planning and resource adequacy, and are reserved to FERC and the states under the FPA.[33]

---

[31] Exhibit QQ (Tri-State, *U.S. DOE Orders Tri-State to Keep Craig Generating Station Unit Operating for Next 90 Days* (Dec. 31, 2025)); *see also* Exhibit B, ¶ 11; Exhibit D, ¶ 15.
[32] FERC (Office of Public Participation), *Energy Markets* (last updated August 18, 2025) (last visited Jan. 26, 2026).
[33] *See* 16 U.S.C. § 824(b)(1); 16 U.S.C. § 824a(b).

FERC oversees the reliability of the bulk power system, which is the network of generation, transmission, and distribution system components across the United States, by reviewing, approving, and enforcing mandatory reliability standards developed by the North American Electric Reliability Corporation ("NERC").[34] FERC designated NERC as the Electric Reliability Organization ("ERO") for the mainland United States in 2006 pursuant to the Energy Policy Act of 2005.[35] NERC is a non-profit international regulatory authority that assures the reliability of North America's bulk power system by creating reliability standards, approved by FERC, that are legally enforceable and include training and communications requirements, and emergency back up plans.[36] These standards apply to all users, owners, and operators of the continental United States' bulk power system.[37] NERC also annually analyzes seasonal and long-term reliability of the bulk power system and assess risk by region using a three-tiered system.[38]

NERC is permitted to delegate authority to regional entities for the purpose of proposing and enforcing reliability standards.[39] NERC therefore divides the North American bulk power system into six regional entities to which it has delegated authority. One of these regional entities is the WECC, which covers most of the Western United States, including all of the states served by Craig Unit 1.[40] WECC is a

---

[34] FERC (Office of Public Participation), *Reliability Explainer* (last updated Aug. 16, 2023) (last visited Jan. 26, 2026).

[35] *See id.*; 16 U.S.C. § 824*o*(a)(2); N. Am. Elec. Reliab. Corp., 116 FERC ¶ 61,062 (2006), at 3, order on reh'g & compliance, 117 FERC ¶ 61,126 (2006).

[36] *Reliability Explainer*, FERC.

[37] 16 U.S.C. § 824o(b)(1).

[38] *See* 18 C.F.R. § 39.11.

[39] 18 C.F.R. § 39.8.

[40] *See* Fully Executed *Amended And Restated Delegation Agreement Between NAERC And WECC* (2021 FERC Revisions – Clean), North American Electric Reliability Corp. (January 1, 2021)

non-profit organization that assures a reliable electric system in the Western Interconnection, a region that covers the Pacific Ocean to the Rocky Mountain states.[41] All of the Craig Unit 1 Owners are members of WECC.[42]

WECC identifies and registers the Reliability Coordinators and balancing authorities that are responsible for maintaining operating conditions under NERC's reliability standards within its region.[43] Reliability Coordinators are the highest level of authority under NERC. They are responsible for the operation of the bulk electric system and have the operating tools, procedures, and authority to prevent or mitigate emergency operating situations.[44] Balancing authorities ensure that power system demand and supply are balanced, manage transfers of electricity and use economic dispatch to optimize the use of generating units and minimize real-time costs, and maintain operating conditions under NERC reliability standards.[45] Southwest Power Pool, Inc. ("SPP") is the Reliability Coordinator for Public Service, Tri-State, and PRPA.[46] WAPA – Rocky Mountain Region Western Area Colorado Missouri ("WACM") is the Balancing Authority for Craig Station.

In addition to this structure, Public Service, PRPA, and Tri-State are now part of the Western Energy Imbalance Market ("WEIS") market, which is a "real-time energy imbalance service market that provides market participants the ability to submit offers to sell and bids to buy imbalance energy, and settles the net supply or

---

[41] EPA, *U.S. Grid Regions* (Nov. 24, 2025).
[42] WECC, *Membership* (2026).
[43] Department, *Learning Series: Energy Security & Resilience*; WECC, *Registration and Certification* (2026).
[44] NERC, *NERCipedia: Reliability Coordinator* (2024).
[45] Department, *Learning Series: Energy Security & Resilience*.
[46] SPP, *Western RC Services* (2026).

obligation for an asset owner."[47] In July of 2025, Public Service was approved to join Markets+, a regional, day-ahead and real-time energy and flexibility reserve product market in the Western Interconnection.[48] Both WEIS and Markets+ are operated by SPP, but are separate from the RTO that SPP also operates.[49] And in December 2025, the CoPUC determined that it is in the public interest for Tri-State to join the SPP's RTO in the Western Interconnection in April of 2026.[50]

The Order states, without support, that the WECC-Northwest Assessment area is experiencing an energy emergency based on NERC's 2024 Long-Term Reliability Assessment ("2024 LTRA"). But NERC, WECC and its designees have not made a similar determination. The Order merely cites to the 2024 LTRA's statement that energy variability is greater in the WECC-Northwest area than other regions, and that supply chain issues are a concern.[51] In the 2024 LTRA, the WECC-Northwest Assessment area included Colorado, Idaho, Montana, Oregon, Utah, Washington and Wyoming. However, in NERC's two more recent assessments, its 2025 Summer Reliability Assessment ("SRA") and 2025-2026 Winter Reliability Assessment ("WRA"), the WECC-Northwest Assessment area no longer includes Colorado and Wyoming, which were moved to the WECC-Rocky Mountain assessment area, or Utah, which is in the WECC-Basin assessment area.[52]

---

[47] SPP, *Western Energy Imbalance Service (WEIS) Quarterly State of the Market* (Feb. 13, 2024) at 4.
[48] CoPUC, Decision No. C25-0697, issued on October 9, 2025, in Proceeding No. 25A-0075E.
[49] SPP, *About Us* (2026).
[50] CoPUC, Decision No. C25-0906, issued on December 16, 2025, in Proceeding No. 25A-0266E, ¶ 2.
[51] Exhibit K (NERC, *2024 Long-Term Reliability Assessment* (Dec. 2024)).
[52] Exhibit L (NERC, *2025-2026 WRA* (Nov. 2025); NERC, *2025 SRA* (May 2025).

In light of this reorganization of the assessment areas, and given the timing of Order, the 2025-2026 WRA is a more relevant assessment for evaluating near-term reliability issues since the WRA specifically covers the upcoming three-month winter period (December-February). This assessment found that "[a]ll assessed areas have adequate resources for normal winter peak load conditions[.]"[53] The 2025-2026 WRA found that WECC-Rocky Mountain, the region that includes Colorado and most of Wyoming, would not require reliance on imports to maintain resource adequacy "under combined extreme peak and extreme derated conditions" and that all assessed areas have adequate resources for normal winter peak load conditions.[54]

Thus, the assessments covering the areas served by Craig Unit 1 for both the 90 day term of the Order and beyond do not conclude that there is an energy shortfall or a reliability concern. Yet, the day before Craig Unit 1's planned retirement, the Department issued a Section 202(c) Order declaring that an emergency exists within the WECC-Northwest assessment area "due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes…"[55] The Order requires the Craig Unit 1 Owners to ensure that the unit is available to operate for the next 90 days at the direction of WACM in its role as Balancing Authority or the SPP West in its role as Reliability Coordinator.[56]

---

[53] Exhibit L at 5.
[54] *Id.,* at 38.
[55] Exhibit A at 1.
[56] *Id*. at 3-4.

**D.     The Craig Order is in line with other federal efforts to support the coal industry.**

On January 20, 2025, President Trump issued Executive Order 14156, "Declaring a National Energy Emergency."[57] That declaration did not provide any factual support for its assertion that the country was in the grips of an electricity emergency. In fact, U.S energy production is at an all-time high and continues to grow.[58] Although the President recently extended the energy emergency declaration for an additional year, he did not cite any new evidence to justify the supposed emergency.[59]

Setting the stage for the Department's plan to use Section 202(c) orders to promote the administration's policy preferences for the nation's energy mix, on April 14, 2025, President Trump issued Executive Order 14262, "Strengthening the Reliability and Security of the United States Electric Grid."[60] This Executive Order directed the Department to streamline and expedite processes for issuing emergency orders under Section 202(c). It also ordered the preparation of a methodology to help identify areas with inadequate reserve margins and directed the use of Section 202(c) orders to prevent certain generation resources from leaving the bulk power system.[61] Pursuant to this Executive Order, the Department published its report titled *Resource*

---

[57] Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 20, 2025).
[58] Victoria Zaretskaya, *The United States was the world's largest liquified natural gas exporter in 2023*, U.S. Energy Info. Admin.: Today in Energy: In-Brief Analysis (Apr. 1, 2024); U.S. Energy Info. Admin., *U.S. Exports of Crude Oil* (last updated Dec. 31, 2025); U.S. Energy Info. Admin., *U.S. Energy Facts Explained: Imports & Exports* (last updated July 15, 2024).
[59] Continuation of the National Emergency With Respect to Energy, 91 Fed. Reg. 1667 (Jan. 12, 2026).
[60] Exec. Order 14262, Strengthening the Reliability and Security of the United States Electric Grid, 90 Fed. Reg. 15521 (Apr. 14, 2025).
[61] 90 Fed. Reg. 15521.

*Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid* ("Resource Adequacy Report" or "Report"),[62] on July 7, 2025.

Colorado and several other states filed a request for rehearing of the Resource Adequacy Report that pointed out the Report's many analytical errors, including flawed and unexplained assumptions for load growth projections and resource retirements and additions.[63] The Department itself acknowledges in the Report that the agency is not equipped to analyze resource adequacy, stating that its own analysis "could benefit greatly from the in-depth engineering assessments which occur at the regional and utility level."[64] Thus, despite issuing a Report intended to guide its use of Section 202(c) authority, the Department does not have the ability to discern whether there is an energy emergency at the regional level.

Nevertheless, the Department proceeded to issue numerous orders under Section 202(c) in 2025 to prevent the retirement of several fossil fuel-fired power plants across the country. In May 2025, the Department issued orders preventing two fossil-fuel generation facilities in Michigan and Pennsylvania from retiring as planned. Both orders failed to identify an imminent energy emergency justifying the units' continued operation, and instead cited only generalized concerns about resource adequacy.[65] Both orders have since been reissued multiple times.[66]

---

[62] Exhibit M (Department, Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid (July 2025)).

[63] Exhibit N (Motion to Intervene and Protective Request for Rehearing by the Attorneys General of Maryland, Washington, Illinois, Michigan, Minnesota, Arizona, Colorado, Connecticut, and New York, filed on August 6, 2025 with the Department).

[64] Exhibit M, at 2.

[65] Exhibit O (Department, Order No. 202-25-3 ("Campbell Order") (May 23, 2025)); Exhibit P (Department, Order 202-25-4 ("Eddystone Order") (May 30, 2025)).

[66] *See* Exhibit I (Department, Order No. 202-25-7 (Aug. 20, 2025") ("Aug. Campbell Extension")); Exhibit U (Department, Order No. 202-25-9 (Nov. 18, 2025) ("Nov. Campbell Extension"); Exhibit V

In December 2025, four additional fossil fuel-fired generation facilities were scheduled to retire, and the Department again issued orders requiring their continued availability. In addition to the Craig Order at issue in this proceeding, the Department ordered that units in Washington and Indiana remain available to operate.[67] Like the Craig Order, the other Section 202(c) orders issued in December also failed to support their emergency determinations with evidence of a specific, imminent energy shortfall or other circumstances that qualify as an emergency under Section 202(c).

## IV.    Statement Of Issues and Specifications of Error

The State of Colorado submits the following statement of issues and specifications of error:

1.    The Order is contrary to law because Section 202(c) only authorizes the Department to respond to specific, imminent, unexpected, and temporary events, while the Order addresses long-term resource adequacy concerns. The statutory text, legislative history, judicial construction, and the Department's regulations all confirm that an emergency must be specific, imminent, unexpected, and temporary. 16 U.S.C. § 824a(c); *Richmond Power & Light of City of Richmond, Ind. v. FERC*, 574 F.2d 610 (D.C. Cir. 1978); S. Rep. No. 74 621, 74th Cong., 1st Sess. (1935); 16 U.S.C. § 824a(a) & (b); *Otter Tail Power Co. v. Fed. Power Comm.*, 429 F.2d 232 (8th Cir. 1970).

2.    The Order is contrary to law because it exceeds the Department's statutory authority by preventing the long-planned retirement of Craig Unit 1. Section 201(b) of the FPA reserves decisions about plant retirement dates to the states, and Section 202(c) does not vest the Department with general regulatory authority over resource adequacy. By abusing a statute meant only for emergencies, the Order intrudes on authority reserved to states and to other federal regulators to regulate resource adequacy. 16 U.S.C. §824(a); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009); *see also Hughes v. Talen*

---

(Department, Order No. 202-25-8 (Aug. 28, 2025) ("Aug. Eddystone Extension")); Exhibit PP (Department, Order No. 202-25-10 (Nov. 25, 2025) ("Nov. Eddystone Extension")).

[67] Exhibit Q (Department, Order No. 202-25-11 (Dec. 16, 2025) ("Centralia Order")); Exhibit S (Department, Order No. 202-25-12 (Dec. 23, 2025) ("Schahfer Order")); Exhibit R (Department, Order No. 202-25-13 (Dec. 23, 2025) ("Culley Order")).

*Energy Mktg., LLC*, 578 U.S. 150, 155 (2016); *Devon Power LLC et al.*, 109 FERC ¶ 61,154, P 47 (2004).

3.   The Order's determinations are not supported by substantial evidence demonstrating an actual emergency, as indicated by the statutory text and structure and defined in Department regulations, that would necessitate continued operation of Craig Unit 1. The Order fails to exercise reasoned decision making and ignores critical facts, including the findings in its own Resource Adequacy Report, NERC's findings, and state and utility analyses. 16 U.S.C. § 824a(c); *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961); *Richmond Power & Light of City of Richmond, Ind. v. FERC*, 574 F.2d 610 (D.C. Cir. 1978); S. Rep. No. 74-621 (1935); 16 U.S.C. § 824a(a) & (b); *Otter Tail Power Co. v. Fed. Power Comm.*, 429 F.2d 232 (8th Cir. 1970); 16 U.S.C. § 824o;;10 C.F.R. § 205.371; 10 C.F.R. § 205.375; *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983; *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168(1962).

4.   The Order is contrary to law because it fails to present substantial evidence for its emergency determination and ignores critical facts. None of the materials cited in the order provide evidence of an emergency in the WECC-Northwest assessment area or regions served by Craig Unit 1. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); Chritton v. National Transportation Safety Board, 888 F.2d 854, 856 (D.C. App. 1989); *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017).

5.   The Order is arbitrary and capricious because it fails to require generation that best meets the claimed emergency. 16 U.S.C. § 824a(c)(1); *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009); *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); 10 C.F.R. § 205.371;

6.   The Order's terms fail to comply with Section 202(c)'s requirements. 16 USC § 824a(c)(1); 16 U.S.C. § 824a(c)(2); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009); *see also, e.g., Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016).

7.   The Order is arbitrary and capricious because it is designed to support the federal administration's policy goal of supporting the coal industry. Dep't of Commerce v. New York, 588 U.S. at 782; Level the Playing Field v. FEC, 961 F.3d 462, 464 (D.C. Cir. 2020) (quoting Hagelin v. FEC, 411 F.3d 237, 242 (D.C. Cir. 2005))

8. The Order violates the National Environmental Policy Act ("NEPA") because it fails to assess the environmental consequences of a major federal action significantly affecting the human environment. 42 U.S.C. § 4321; *et seq.*; 10 CFR § 1021.103.

## V.   Request For Rehearing

The Department must grant rehearing and rescind the Order because it suffers from numerous legal and factual deficiencies. Ignoring the legal standards that constrain the exercise of emergency authority under Section 202(c), and acting in disregard of the facts, the Order improperly impinges on state authority over resource planning decisions, imposes unreasonable and unnecessary costs, fails to include required provisions to minimize environmental harms, and advances the administration's preferred energy source with no reasonable basis. For these reasons, the Order is contrary to law, arbitrary and capricious, and unsupported by substantial evidence. The Department should withdraw it.

**A.   The Order is contrary to law because it improperly expands the use of Section 202(c)'s emergency authority beyond the limited scope set forth in the FPA.**

Section 202(c) authorizes the Department to command action from a utility unconstrained by many of the core procedural safeguards, jurisdictional boundaries, and substantive limitations normally imposed by the FPA.[68] This power far exceeds the Department's normal authority, and is therefore restricted to the extraordinary and limited circumstances set forth in the statute.[69] The FPA's statutory text and

---

[68] *See* 16 U.S.C. § 824a(c).
[69] *Id.* ("[d]uring the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes…").

structure, along with the Department's regulations, historic practice, and case law interpreting the FPA all make clear that any such event, including a "shortage of electric energy" or the "demand for electric energy" must be one that constitutes a bona fide "emergency"—*i.e.*, a specific, imminent, unexpected and temporary event. The Order exceeds the Department's authority because those extraordinary and limited circumstances do not exist here, and the Department is instead attempting to use the Order to regulate long term resource adequacy, which is expressly reserved to the states and FERC.

> i. *The language, history and structure of Section 202(c) limit the Department to addressing specific, imminent, unexpected and temporary supply shortfalls.*

Section 202(c)'s text authorizes the Department to act only upon an "emergency."[70] The statute itself does not define "emergency."[71] At the time Section 202(c) was enacted, "emergency" was defined as a "sudden or unexpected appearance or occurrence…An unforeseen occurrence or combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency."[72] Contemporary dictionaries likewise define "emergency" as "an unforeseen combination of circumstances or the resulting state that calls for immediate action," or an "urgent need for assistance or relief."[73]

---

[70] *Id.*

[71] Although emergency is not defined, the statute does indicate that an emergency includes "the continuance of any war in which the United States is engaged." 16 U.S.C. § 824a(c)(1).

[72] *Emergency*, Webster's New International Dictionary of the English Language (1930).

[73] *Emergency*, Merriam-Webster Dictionary (Jan. 11, 2026); *See* also Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 812 n.147 (2025) (noting that dictionaries have given the term "emergency" the "same meaning for many years").

The remainder of Section 202(c)'s plain language also underscores the urgency and immediacy inherent in the word "emergency." The text's use of the present tense underscores its focus on imminent and certain shortfalls, empowering the Department to act only where "an emergency exists."[74] That near-term focus, along with the fact that this Section 202(c) authority is "temporary" authority,[75] precludes use of Section 202(c) to pursue long-term policy goals such as preference for a particular fuel source[76] or interventions to address general concerns about long-term resource adequacy.[77]

The legislative history of the FPA confirms that Congress intended Section 202(c) authority to be used for true emergencies. In a report accompanying the FPA's original passage in 1935, Section 202(c) is described as a "temporary power" to be used in response to "crises:"

> This is a temporary power designed to avoid a repetition of the conditions during the last war, when a serious power shortage arose. Drought and other natural emergencies have created similar crises in certain sections of the country; such conditions should find a Federal agency ready to do all that can be done in order to prevent a break-down in electric supply.[78]

---

[74] 16 U.S.C. § 824a(c).

[75] *Id.*

[76] *Richmond Power & Light*, 574 F.2d at 615 (Section 202(c) "is aimed at situations in which demand for electricity exceeds supply and not those in which supply is adequate but a means of fueling its production is in disfavor.").

[77] *See Coalition for Competitive Electricity, Dynergy Inc. v. Zibelman*, 906 F.3d 41, 50 (2018) (citing 16 U.S.C. § 824(b)) (FPA "leaves to the States alone" the authority "to regulate energy production and facilities used for the generation of electric energy"); *see also Arkansas Elec. Co-op Corp. v. Arkansas Public Service Com'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.").

[78] S. Rep. No. 74-621 at 49 (1935).

Section 202's overall structure also highlights Section 202(c)'s emphasis on imminent, near-term concerns. Section 202 established three tiers of federal involvement in grid coordination. Section 202(a)[79] and Section 202(b)[80] together define and limit the tools by which the federal government may pursue "abundant" energy supplies in the normal course. Section 202(a) states that the federal government may seek "abundant supply of electric energy" by "divid[ing] the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy." Section 202(b) provides a backstop if the voluntary interconnection and coordination provided for in Section 202(a) fails, allowing the federal government to order "physical connection . . . to sell energy or to exchange energy" upon application, and "after an opportunity for hearing."[81] However, Section 202(b) specifically states that the government has "no authority to compel the enlargement of generating facilities for such purposes."[82]

The resulting statutory "machinery for the promotion of the coordination of electric facilities" comprises the following: in subsection (a), an instruction to establish a general framework meant to facilitate "coordination by voluntary action;" in subsection (b), "limited authority to compel interstate utilities to connect their lines and sell or exchange energy," subject to defined procedural and substantive requirements, when "interconnection cannot be secured by voluntary action;" and in subsection (c), "much broader" but "temporary" authority "to compel the connection

---

[79] 16 U.S.C. § 824a(a).
[80] 16 U.S.C. § 824a(b).
[81] *Id.*
[82] *Id.*

22

of facilities and the generation, delivery, or interchange of energy during times of war or other emergency."[83]

This structure relies on voluntary action for everyday energy planning, specifies limited authority where that voluntary system fails, and allows for "temporary" central command-and-control only in case of "emergency." Section 202(c) authority applies narrowly to immediate and unavoidable "break-down[s] in electric supply," rather than mere desire for more abundant supply in the future.[84] Interpreting Section 202(c)'s "emergency" powers to encompass longer-term concerns such as potential shortfall years into the future would unwind the careful balance of voluntary, market-driven action and federal authority set out by Congress. Therefore, such an interpretation cannot be squared with the statutory text, history and structure of Section 202 as required by law.

> ii. *Section 215 of the FPA explicitly assigns federal regulation of long term resource adequacy to FERC, further emphasizing that the Department's Section 202(c) authority is limited to imminent emergencies.*

Section 215 of the FPA, 16 U.S.C. § 824o ("Section 215"), which delineates the scope of federal power to enforce mandatory long-term reliability requirements, confirms that Section 202(c) cannot be used to enforce the Department's preference for long-term reliability solutions. Congress added Section 215 to the FPA in 2005 precisely because the FPA as it then existed, which included Section 202(c), did not provide the federal government with the power to enforce measures designed to

---

[83] S. Rep. No. 74-621 at 49 (1935).
[84] *Id.*

ensure broad, long-term reliability.[85] Implementation of Section 215, including the

approval and enforcement of reliability standards for all entities operating in the bulk

power system, is left to FERC and its designated ERO, not the Department.[86]

By enacting Section 215, Congress newly created a comprehensive and carefully

circumscribed scheme to allow FERC—not the Department—to address long-term

reliability requirements. That statutory scheme strikes a careful balance between

state and federal authority, and between private, market-driven decisions and top-

down control. Reliability standards are devised by NERC independent "of the users

and owners and operators of the bulk-power system" but with "fair stakeholder

representation."[87] FERC may approve or remand those standards (but not replace

them with its own) and must "give due weight" to NERC's "technical expertise" while

independently assessing effects on "competition."[88] Section 215 specifies

enforcement mechanisms and procedures for reliability standards and carefully

preserves state authority over "the construction of additional generation" and

---

[85] *See* Rules Concerning Certification of the ERO; and Procedures for the Establishment, Approval, and Enforcement of Electric Reliability Standards, 70 Fed. Reg. 53,117, 53,118 (Sept. 7, 2005) ("In 2001, President Bush proposed making Electric Reliability Standards mandatory and enforceable[,]" leading to enactment of Section 215 in 2005); National Energy Policy Development Group, *Reliable, Affordable, and Environmentally Sound Energy for America's Future* (May 2001) at 7-6 (noting that "[r]egional shortages of generating capacity and transmission constraints combine to reduce the overall reliability of electric supply in the country" and that "[o]ne factor limiting reliability is the lack of enforceable reliability standards" because "the reliability of the U.S. transmission grid has depended entirely on voluntary compliance," and then recommending "legislation providing for enforcement" of reliability standards) (emphasis added); S. Rep. No. 109-78,109th Cong., 1st Sess. at 48, Section 1211 (2005) (Section 215 "changes our current voluntary rules system to a mandatory rules system" for long-term reliability); *see Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009) (noting that prior to the Energy Policy Act of 2005, "the reliability of the nation's bulk-power system depended on participants' voluntary compliance with industry standards").
[86] 16 U.S.C. § 824o.
[87] 16 U.S.C. § 824o(c)(2)(A); s*ee also id*. § 824o(a)(3) (defining reliability standards as "a requirement … to provide for reliable operation of the bulk-power system").
[88] *Id*. § 824o(d)(2)-(4).

regulation of in-state resource adequacy, establishing regional advisory boards to ensure appropriate state input on the administration of reliability standards.[89]

Interpreting Section 202(c) to permit the Department to mandate generation based on its determination that non-imminent and unsubstantiated reliability concerns create an "emergency" would effectively allow the Department to bypass Section 215's procedural safeguards, constraints on federal authority, and protection of state power over long-term reliability. This would impermissibly contradict Congress' clear intent as expressed in its more recent reliability-specific provisions, enacted with the understanding that the Department had no authority to address long-term reliability through Section 202(c).[90] "Congress's specific and limited enumeration of [agency] power" over a particular matter in one section of the FPA "is strong evidence that [a separate section] confers no such authority on [an agency]."[91] Congress has, in Section 215, directly established the mechanisms by which the federal government may compel action to ensure long-term electric-system reliability, and that authority does not rest with the Department. In so doing, Congress has confirmed that the word "emergency," as used in Section 202(c), does not extend to long-term reliability concerns and only applies to specific, imminent, unexpected and temporary events.

---

[89] *Id.* §§ 824o(e), -(i)-(j).
[90] *See also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000) ("The meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.").
[91] *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401 (D.C. Cir. 2004).

*The Order is arbitrary, capricious and contrary to law because it contradicts the Department's regulations interpreting Section 202(c) and its historic practice in applying Section 202(c).*

The Department's regulations confirm that Section 202(c)'s authority is confined to imminent and unexpected resource shortages rather than long-term reliability concerns. Those regulations define "emergency" for the purposes of Section 202(c) to mean circumstances that arise suddenly and unexpectedly:

> "Emergency," as used herein, is defined as an unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown of facilities for the generation, transmission or distribution of electric power. Such events may be the result of weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected "entity" to prevent. An emergency also can result from a sudden increase in customer demand, an inability to obtain adequate amounts of the necessary fuels to generate electricity, or a regulatory action which prohibits the use of certain electric power supply facilities.[92]

This focus on specific events like weather conditions, acts of God, or unforeseen circumstances outside of the power of the affected entity to prevent, along with the reference to a "sudden increase in customer demand" producing a "specific inadequate power supply situation,"[93] foreclose the Department from using 202(c) authority to address vague long-term supply and reliability issues, such as those articulated in the Order.

This need for specificity is repeated in the Department's regulations defining an inadequate energy supply: "[a] system may be considered to have inadequate" supply when "the projected energy deficiency…will cause the applicant [for a 202(c)

---

[92] 10 C.F.R. § 205.371.
[93] *Id.*

Order] to be unable to meet its normal peak load requirements based upon use of all of its otherwise available resources so that it is unable to supply adequate electric service to its ultimate customers."[94] An emergency may exist where past planning failures produce an immediate, present-tense shortfall, but the Department has no authority to commandeer long-term planning merely because it deems current plans inadequate to meet long-term needs.[95] As the Department stated when it promulgated these regulations, the statute allows the Department to provide "assistance [to a utility] during a period of unexpected inadequate supply of electricity," but does not empower it to "solve long-term problems."[96]

Until 2025, the Department's orders complied with this regulatory scheme and the agency used its Section 202(c) authority only in response to concrete, particularized emergencies, subject to narrow, appropriate limitations. Established "practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred."[97] Until recently, the Department has used Section 202(c) to address specific, imminent, and unexpected shortages, never to address longer-term reliability concerns or demand forecasts.[98] As pointed out by the Congressional

---

[94] 10 C.F.R. § 205.375.
[95] *See id.* (requiring present inability to meet demand to demonstrate inadequate energy supply).
[96] Emergency Interconnection of Electric Facilities and the Transfer of Electricity to Alleviate an Emergency Shortage of Electric Power, 46 Fed. Reg. 39,984, 39,985–86 (Aug. 6, 1981).
[97] *See FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941).
[98] *See, e.g.*, Department, Order No. 202-22-4 (Dec. 24, 2022) at 1 (responding to ongoing severe winter storm producing immediate and "unusually high peak load" between December 23 and December 26); Department, Order No. 202-20-2 (Sept. 6, 2020) (responding to shortages produced by ongoing extreme heat and wildfires); *see also* Rolsma, 57 Conn. L. Rev. at 803-4 (describing "sparing[]" use of Section 202(c) outside of wartime shortages during the twentieth century).

Research Service, the orders issued by the Department in May 2025 (and subsequently renewed) to keep coal plants open "all involve[d] seemingly new interpretations of the emergency authority."[99] The Order at issue in this proceeding continues this improper use of Section 202(c).

Similarly, before 2025, the Department used Section 202(c) on only three occasions to delay the retirement of generation facilities.[100] Each case met the following four criteria: (1) the order was requested by a system operator or governmental body; (2) the generation facility had ceased or would soon cease operation due to an inability to comply with environmental laws; (3) the request aimed to address a concrete and particularized emergency threatening an imminent loss of load; and (4) the Department tailored its order to go no further than necessary to address the emergency.

---

[99] Cong. Research Serv., *Federal Power Act: The Department of Energy's Emergency Authority*, CRS Report No. R48568, at 3 (June 12, 2025).

[100] In 2005, the Department issued an order directing the continued operation of a facility in Alexandria, VA, after the facility was abruptly closed based on noncompliance with its air permit. The order only applied when one or both of the 230 kv transmission lines serving downtown D.C. were out of service. Department, Order No. 202-05-3 (Dec. 20, 2005). In 2017, an Oklahoma state agency asked the Department to direct the continued operation of a unit that would otherwise close because the unit was needed to provide dynamic reactive power support to the local grid, as confirmed by its reliability coordinator. The unit was needed because another unit at the station had been struck by lightning, and the third unit's construction had been delayed due to flooding delaying essential project materials. The Department subsequently ordered the unit to remain in operation for 90 days or until one of the other two units came online, to provide dynamic reactive power support when called upon by its reliability coordinator. Department, Order No. 202-17-1 (Apr. 14, 2017). Finally, in 2017, two Virginia utilities asked the Department to direct the continued operation of two units of a power station because they were necessary to prevent uncontrolled power disruptions and shedding of critical load. Letter from PJM Interconnection, LLC, to the Department (Aug. 24, 2017).

The Department's unexplained deviation from its prior interpretation of the statute, as demonstrated through its past practice, is unlawful, arbitrary and capricious.[101] And the Department cannot deviate from its regulations without conducting new notice and comment rulemaking and providing a reasonable basis for any change.[102] A cornerstone of administrative law is "that an agency must provide[ ] a reasoned explanation for departing from precedent or treating similar situations differently."[103] For this reason, "an interpretation of a legislative rule cannot be modified without the notice and comment procedure that would be required to change the underlying regulation—otherwise, an agency could easily evade notice and comment requirements by amending a rule under the guise of reinterpreting it."[104] The Department has not undertaken any such notice and comment procedure here and has not provided any reasoned justification for its recent departure from the binding requirements and interpretations of its governing statute and regulations.

    iv.    *Courts have found that the Department's use of Section 202(c) is limited to true emergencies and the Department is bound by the courts' statutory interpretation.*

There is little case law on Section 202(c). However, two decisions that have addressed the Department's authority under Section 202(c) both recognize that the

---

[101] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.").

[102] *See* 5 U.S.C. § 553; *F.C.C.*, 566 U.S. at 515 (holding that an agency cannot simply change position on an issue without "a reasoned explanation" and "awareness that it is changing position.").

[103] *New England Power Generators Ass., Inc. v. FERC*, 881 F.3d 202, 210-12 (D.C. Cir. 2018) (quoting *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014)).

[104] *Env't Integrity Project v. EPA*, 425 F.3d 992, 995 (D.C. Cir. 2005) (internal citations omitted); *see also Center for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (internal citations omitted) ("When an agency changes its position, it must: (1) "display [ ] awareness that it is changing position," (2) "show "the new policy is permissible under the statute," (3) "believe[ ]" the new policy is better, and (4) provide "good reasons" for the new policy.").

Department's power under Section 202(c) is limited to specific, imminent, unexpected and temporary events.

First, during the 1973 oil embargo, the Federal Power Commission called for a voluntary transfer of electricity from non-oil power plants to areas of the country that relied heavily on oil, but the New England Power Pool petitioned for a Section 202(c) order because it was not convinced the voluntary program would work.[105] The Commission declined to issue a Section 202(c) order, and instead facilitated an agreement between state commissions and supplying utilities.[106] In *Richmond Power and Light of City of Richmond, Indiana v. FERC*, the D.C. Circuit upheld the Commission's decision to not invoke Section 202(c).[107] The utility argued that the country's dependence on foreign oil, and the high cost and uncertain supply of foreign oil, left the country with a continuing emergency, but the court agreed with the Commission's argument that the facilitated agreement had worked, service was never interrupted, and there was no need for a Section 202(c) order.[108] The court highlighted that the statute "speaks of 'temporary' emergencies, epitomized by wartime disturbances, and is aimed at situations in which demand for electricity exceeds supply[.]"[109] The court upheld the Commission's view that Section 202(c) cannot be used when "supply is adequate but a means of fueling its production is in disfavor."[110]

---

[105] *Richmond Power & Light*, 574 F.2d at 613.
[106] *Id.*
[107] *Id.* at 614.
[108] *Id.* at 615.
[109] *Id.*
[110] *Id.*

The Eighth Circuit Court of Appeals has also held that Section 202(c) can only be used to respond to immediate crises. In *Otter Tail Power Co. v. Fed. Power Comm'n.*, a utility insisted a Section 202(c) order was necessary to properly order the utility to connect to a municipal power provider. The demand for electricity in the city had increased, and the peak load of the municipal power provider was high enough that both of its two generators would likely be needed simultaneously in the near future, which could cause a possible loss of service if one of them malfunctioned during a peak period.[111] Instead of issuing a 202(c) order, the Commission issued an order under Section 202(b), which the utility argued was incorrect.[112]

In upholding the Commission's decision, the court distinguished between an emergency that is likely to occur and one that is actually occurring, concluding that Section 202(b) applies to the former, while Section 202(c) applies to the latter:

> On its face, § 202(c) enables the Commission to react to a war or national disaster and order immediate interconnection of the facilities to maintain electrical service during such emergency. . . On the other hand, § 202(b) applies to a crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the Commission.[113]

Therefore, the court agreed that a potential crisis in the foreseeable future was not an emergency, making this current situation "just the type of situation to fit into a § 202(b) hearing rather than § 202(c)."[114]

---

[111] *Otter Tail Power*, 429 F.2d at 233-234.
[112] *Id.*
[113] *Id.* at 234.
[114] *Id.*

Because courts, not agencies, decide "all relevant questions of law" arising on review of agency actions, the Department is bound by these courts' "best reading" of the statutory language.[115]

**B.    Section 202(c) does not vest the Department with general regulatory authority over resource adequacy, which is regulated by the states and FERC under other provisions of the FPA.**

The FPA preserves states' authority over generation facilities and resource adequacy planning, and Section 202(c) does not vest the Department with general regulatory authority over resource adequacy. Under the FPA, states are responsible for their own resource adequacy and decisions about generation facilities, and FERC is responsible for assuring the reliability of the nation's bulk power system. Because there is no imminent shortfall or other circumstance constituting an emergency, the Order is an illegal attempt to regulate long term resource adequacy by misusing the Department's Section 202(c) authority.

   *i.    The FPA grants authority over generation and resource adequacy to the states.*

The structure and language of the FPA reflect Congress' deliberate choice to preserve the states' traditional authority over generating facilities and to limit the Department's emergency authority. The FPA states that "the Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy…"[116] Congress also recognized the states' exclusive authority over generating

---

[115] *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392, 399-400 (2024).
[116] 16 U.S.C. § 824(b)(1).

facilities in Section 202(b), which provides that FERC's interconnection authority does not include the power to "compel the enlargement of generating facilities for such purposes."[117] FERC's role in regulating electricity generation and transmission is related to matters of interstate commerce and extends "only to those matters which are not subject to regulation by the States."[118]

Pursuant to the FPA, "[t]he states are thus authorized to regulate energy production . . . and facilities used for the generation of electric energy."[119] Decisions around what facilities to build, whether they remain feasible, and retail rates are areas governed by the states.[120] Courts have held that Section 201(b)(1) reserves to the states authority over electric generating facilities, including that states retain the right "to require the retirement of existing generators" or to take any other action in their "role as regulators of generation facilities."[121] FERC has acknowledged that "[r]esource adequacy is a matter that has traditionally rested with the states, and it should continue to rest there. States have traditionally designated the entities that are responsive for procuring adequate capacity to serve loads within their respective jurisdictions."[122]

The electric power sector is governed by longstanding principles of cooperative federalism encouraged in Section 209(b) of the FPA, which explicitly declares that FERC may consult with states "regarding the relationship between rate structures,

---

[117] 16 U.S.C. § 824a(b).
[118] 16 U.S.C. § 824(a).
[119] *Coal. for Competitive Elec.*, 906 F.3d at 50.
[120] *Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 205 (1983).
[121] *Conn. Dep't of Pub. Util.*, 569 F.3d at 481; *see also Hughes*, 578 U.S. at 155.
[122] *Devon Power LLC, et al.*, 109 FERC ¶ 61,154, P 47 (2004).

costs, accounts, charges, practices, classifications, and regulations of public utilities

subject to the jurisdiction of such State commission and of the Commission."[123] FERC

has embraced these cooperative federalism principles and developed long-standing

consultation practices with the states, including through creation of a Joint Federal-

State Task Force,[124] and more recently, a Federal-State Current Issues Collaborative

which was formed due to the success of the Task Force.[125] The importance of this

cooperation is evident in the Department's own Resource Adequacy Report, which

flagged that it could have benefitted greatly from cooperation with the states due to

the "in-depth engineering assessments which occur at the regional and utility

level."[126]

 In the Order, the Department seeks to substitute its own judgment about which

resources should be employed to maintain resource adequacy for the states'

decisions, despite these decisions resting firmly in the jurisdiction of the states.

Section 202(c) does not provide the Department with the authority to mandate that

resources remain running to address long-term resource adequacy. If Congress

intended to vest regulatory authority over long-term resource adequacy in Section

202(c) and displace state law, it would have needed to make that intent

"unmistakably clear."[127] Section 202(c) says that the Department may "require by

---

[123] 16 U.S.C. § 824h(b).

[124] FERC, *Joint Federal-State Task Force on Electric Transmission* (Sept. 3, 2025).

[125] FERC, *Federal-State Current Issues Collaborative* (Jan. 21, 2026).

[126] Department, *Resource Adequacy Report Evaluating the Reliability and Security of the United States Electric Grid* (July 2025) at 2.

[127] *Gregory v. Ashcroft,* 501 U.S. 452, 460 (1991) (The clear statement rule requires Congress to make its intent unmistakably clear if it intends a statute to alter the usual constitutional balance between the federal government and the states.); *see also DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 169 (2d Cir. 1993) (Congress must express an affirmative intention to use a statute to alter the federal balance.).

order . . . such generation . . . of electric energy as in its judgment will best meet the emergency and serve the public interest."[128] Empowering the Department to generally determine which power plants may retire across every utility and independent power producer across the entire country would have profound implications for rates, state sovereignty, and a broad array of other state policy and stakeholder interests. If Congress had intended to do that, it would not have done so through the only provision in the FPA that empowers the Department to act outside normal procedural safeguards.

The Supreme Court has rejected statutory interpretations where an agency "claim[s] to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority."[129] The Department may not radically reinterpret a 90-year-old statute to manufacture a basis to exercise much broader authority than it ever has in the past. Previous exercises of Section 202(c) authority have been at the request of a system operator or governmental body and in a manner narrowly tailored to respond to a concrete and particularized emergency. Prior to the current administration, the Department has never issued a Section 202(c) order to impose its policy preferences to contravene the judgment of those bodies properly responsible for ensuring resource adequacy, *i.e.*, the states and FERC. For these reasons, the Order should be withdrawn.

---

[128] 16 U.S.C. § 824a(c)(1).
[129] *W. Virginia v. EPA*, 597 U.S. 697, 724, (2022) (quoting *Util. Air. Regul. Grp. V. E.P.A.*, 573 U.S. 302, 324 (2014)) (internal quotations omitted).

        *ii.*       *The Order improperly infringes on authority granted to states and FERC under the FPA by attempting to regulate long-term resource adequacy and generation.*

The Department is attempting to regulate long term resource adequacy and energy production under the guise of a Section 202(c) emergency, and is therefore intruding on the FERC and state authority discussed above.

It is clear from the Order, the Department's Resource Adequacy Report, and statements by President Trump, and the Department, that the Department is using its Section 202(c) authority for circumstances beyond actual emergencies. The Order repeatedly references long term reliability. For example, the Department's determination that an emergency exists rests on the assertion of a long term concern that "increasing demand and shortage from accelerated retirement of generation facilities . . . could lead to the loss of power to homes, and businesses" that are "likely to continue in subsequent years."[130] The Order also cites the LTRA's statement regarding resource retirements between now and 2028, that WECC's Northwest-Central subregion will have demand growth over the next decade, and that Colorado will have a certain amount of coal-fired generating capacity retired by 2029.[131] Demand growth and retirements occurring over the next decade fall into the realm of long term resource planning, not an imminent Section 202(c) emergency, which must be unexpected, sudden, and temporary.[132]

---

[130] Exhibit A at 3.
[131] *Id.,* at 2.
[132] Section V.A, supra.

Both the Department and President Trump have publicly acknowledged that their goal is to regulate long term resource adequacy and mandate coal generation. the Department Secretary Wright has stated that "[t]he goal [of the recent 202(c) orders] is to stop the political closure of coal plants."[133] The "Clean Beautiful Coal" Executive Order directed the Department to "identify regions where coal-powered infrastructure is available and suitable for supporting AI Data centers; assess the market, legal and technological potential for expanding coal-based infrastructure to power data centers to meet the electricity needs of AI…"[134] These statements demonstrate a clear intention to use coal plants to meet long term resource adequacy needs, which exceeds the Department's Section 202(c) emergency authority.

**C.     The Order fails to present substantial evidence for its emergency determination and ignores critical facts.**

Agencies "must examine the relevant data and articulate a satisfactory explanation for [their] actions, including a rational connection between the facts found and the choice made[,]" and make findings that are supported by substantial evidence.[135] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[136] Similarly, orders under the FPA must reflect "a principled and reasoned decision supported by the evidentiary record."[137] Here, the Department failed to provide evidence of an imminent resource

---

[133] Department, *Energy Department Convenes First National Coal Council Meeting Under Renewed Charter, Reaffirming Coal's Role in Unleashing American Energy* (Jan. 15, 2026).
[134] Exec. Order No. 14241, 90 Fed. Reg. 15,517 (Apr. 14, 2025).
[135] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).
[136] *Chritton*, 888 F.2d at 856 (quoting Refrigerated Transport Co., Inc. v. I.C.C., 616 F.2d 748, 751 (5th Cir.1980) (quoting Chem-Haulers, Inc. v. United States, 536 F.2d 610, 617 (5th Cir.1976)).
[137] *Emera Maine*, 854 F.3d at 22.

adequacy shortfall, making the Order contrary to law. The purported evidence of an emergency the Order cites is: the 2024 LTRA, WECC's Western Assessment of Resource Adequacy, and the Department's Resource Adequacy Report; general load growth in the WECC-Northwest region and generation retirement in Colorado; the Grid Reliability and Energy Emergency Executive Orders; and data center load growth. Contrary to the Order's claims, these reports and observations do not provide sufficient evidence of an energy emergency in the WECC-Northwest region or the areas served by Craig Unit 1.

> i.     *NERC's assessments do not establish that there is an energy emergency in the areas served by Craig Unit 1.*

The Order cites the NERC 2024 LTRA's statement that energy variability is greater in the Northwest than other regions, and that the WECC-Northwest assessment area anticipates baseload resource retirements to be primarily replaced by solar, wind, and battery, which increases variability and implicates some supply chain concerns.[138] The Order relies on these statements to assert the WECC-Northwest assessment area is experiencing an energy emergency. This both mischaracterizes the 2024 LTRA's conclusions and ignores more relevant and recent NERC assessments. By failing to consider relevant facts and to support its findings with substantial evidence, the Department's Order is contrary to law.

The Department's choice to rely on the 2024 LTRA as evidence of an emergency is fundamentally flawed. NERC serves an important advisory role by providing recommendations about risks to the grid, but ultimately, determinations

---

[138] Exhibit A.

about generation resources remain within state authority.[139] Importantly, NERC's reports do not examine regions at the level of granularity that would be required to determine whether a particular resource is essential for regional resource adequacy. The reports only provide the anticipated planning reserve margins of large regions as a whole. The purpose of NERC assessments are to identify for grid operators constraints that might arise and implicate grid reliability if not mitigated.[140] Thus, even regions designated as at risk are not necessarily grid emergencies, they are merely periods of time during which the relevant grid operators must take mitigation measures to maintain grid security, under their set procedures. In addition, the 2024 LTRA was published more than a year ago and relies on data almost two years old. It assesses the adequacy of planned resources to meet electricity demand across North America over the next ten years.[141] The 2024 LTRA does not address short-term reliability issues. Therefore, this report cannot support a decision by the Department to keep one power plant open in the name of a general region-wide emergency.

Even if it was an appropriate assessment for the Department to rely upon, the 2024 LTRA does not actually demonstrate an emergency for the WECC-Northwest assessment area, contrary to the Order's claims. The Order cherry picks certain information from the 2024 LTRA: citing its statement that the WECC-Northwest assessment area anticipates retiring 5 Gigawatt ("GW") of baseload resource retirements between 2024 and 2028, which will be replaced by solar, wind, and

---

[139] NERC, *Reliability Assessments* (2026).
[140] Exhibit L.
[141] Exhibit K.

batteries, and that supply chain issues preventing the construction of battery systems are a concern. The Order conveniently ignores the 2024 LTRA's entire analysis of the WECC-Northwest assessment area's forecasted resource adequacy, and its calculation that the WECC-Northwest has anticipated reserve margins (when including announced generation retirements) of 38.9% for 2026, 35.6% for 2027, and 30.7% for 2028.[142] The 2024 LTRA found that the WECC-Northwest region has "negligible unserved energy and load-loss risk."[143]

Although the 2024 LTRA identified a potential shortfall starting in summer 2029, this potential shortfall was projected only if new resources planned in the region were "significantly delayed," in which case "imports may be necessary."[144] A potential shortfall starting over three years from now—and only if planned resources are significantly delayed—does not provide sufficient evidence to support an emergency declaration for the 90 days covered by the Order. And even if "significant delays" create risk in summer 2029, the 2024 LTRA suggests that imported power will be sufficient to cover any shortfall, once again undermining any case for mandating continued operation of a single generating unit.

The 2024 LTRA also found that the WECC-Southwest region, which includes Arizona, has anticipated reserve margins (when including announced generation retirements) of 35.6% for 2026 and 31.6% for 2027.[145] The WECC-Southwest region does not show any shortfall of existing certain and net firm transfers until 2028, when

---

[142] *Id.,* at 20.
[143] *Id.,* at 129.
[144] *Id.*
[145] *Id.,* at 20.

imports may become necessary, but only if new resources were significantly delayed.[146]

As shown in the figure below, WECC-Northwest and WECC-Southwest, which covers all the states served by Craig Unit 1, are designated as normal risk, which means a low likelihood of electricity supply shortfall even when demand is above forecasts or resource performance is abnormally low.[147]

Figure 1: 2024 LTRA Risk Area Summary 2025-2029[148]



Next, the Order completely fails to acknowledge the two more recent short-term reliability assessments, the 2025-2026 WRA and the 2025 SRA, which evaluate overall operating reliability for the assessed regions on a seasonal basis and account for near-term resource availability impacts such as outages on the peak operating periods for the summer and winter.[149] The 2025-2026 WRA is NERC's most recently

---

[146] *Id.,* at 132.
[147] *Id.,* at 6.
[148] *Id.,* at 6.
[149] NERC, *ERO Enterprise Reliability Assessment Process Document* (Jan. 2024).

published report and covers the current three-month winter period (December 2025-February 2026)—approximately the same time period covered by the Order. It evaluates the generation resource and transmission system adequacy necessary to meet projected demands and operating reserves and identifies potential reliability issues of interest and regional risk.

The Department's reliance on the 2024 LTRA is also problematic because NERC changed the geographic scope assessment areas for the 2025 SRA and 2025-2026 WRA. The 2024 LTRA includes Colorado, Utah, and Wyoming in the WECC-Northwest assessment area, and Arizona is in the WECC-Southwest assessment area.[150] Since the Order is issued to Craig Unit 1 in Colorado, and only references the LTRA and the WECC-Northwest area, it appears the Order is relying on the 2024 LTRA's scope of the WECC-Northwest area. Importantly, the 2025 SRA and 2025-2026 WRA do not include any of the states served by Craig Unit 1 in the WECC-Northwest. For these assessments, the WECC-Rocky Mountain area, not the WECC-Northwest area, includes Colorado and most of Wyoming, WECC-Southwest includes Arizona, and WECC-Basin includes Utah and the rest of Wyoming.[151] The Order ignores that NERC changed the assessment areas used in the 2024 LTRA to "more accurately reflect operational and planning realities, as well as the footprints of various entities[,]"[152] and instead refers to the outdated regions used in the 2024 LTRA. The Department should reconsider the

---

[150] Exhibit K at 127, 131.
[151] NERC, *2025 SRA* (May 2025), at 36.
[152] WECC, *2025-2026 WRA Western Overview*.

Order because the scope of the declared emergency does not match the assessment area.[153]

The 2025-2026 WRA found that "all assessed areas have adequate resources for normal winter peak load conditions."[154] WECC-Rocky Mountain, which includes Colorado and most of Wyoming, and WECC-Southwest, which includes Arizona, were not found to be at risk of electricity supply shortfalls even in more extreme winter conditions extending over a wide area.[155]

Figure 2: 2025-2026 WRA Winter Reliability Risk Area Summary[156]



---

[153] The mismatch between the assessment area and the scope of the purported emergency will also complicate operations and cost recovery actions. Because Craig Unit 1 does not serve the majority of states in the WECC-Northwest assessment area, it is unclear how Craig Unit 1 could be operated to meet an emergency in that area, and unclear which ratepayers should be responsible for the costs of any such operations. Colorado does not concede that Colorado ratepayers should be responsible for these costs.
[154] Exhibit L at 5.
[155] *Id.,* at 5.
[156] *Id.,* at 6.

According to the 2025-2026 WRA, the WECC-Rocky Mountain area will **not** need to rely on imports to maintain resource adequacy even under combined extreme peak and extreme derated conditions, and operating reserve margins are expected to be met before needing imports in all winter scenarios.[157] The region has an anticipated total internal demand of 11,501 MW, and 17,768 MW of certain capacity, which does not include planned capacity and anticipated resources.[158] This leaves an anticipated reserve margin of a staggering 61.7%, which is over triple the reference margin level of 18.2%.[159] By contrast, Craig Unit 1 could provide a maximum of 222 MW to the WECC-Rocky Mountain area, which would have a negligible impact on the already high anticipated reserve margin.

The 2025-2026 WRA also expects WECC-Southwest to be resource adequate under all winter expected and extreme energy availability and demand scenarios before needing imports.[160] WECC-Southwest has a total demand of 21,147 MW and a certain capacity of 40,135 MW before accounting for planned capacity and anticipated resources.[161] This leaves an anticipated reserve margin of 104.4%.[162]

WECC-Basin (which includes Utah, where PacifiCorp owns a mere 19% of Craig Unit 1, or 82 MW of the unit's total capacity) has sufficient capacity for expected peak conditions and an anticipated reserve margin of 29.6% for this season.[163] This means that expected resources meet operating reserve requirements under normal

---

[157] *Id.,* at 38.
[158] *Id.,* at 49.
[159] *Id.*
[160] *Id.,* at 39.
[161] *Id.,* at 49.
[162] *Id.*
[163] *Id.,* at 6, 48.

peak demand scenarios. The WECC-Basin region is designated as "elevated risk" in the 2025-2026 WRA because it would require external assistance only during a combination of above normal peak demand and high generator outages in extreme conditions.[164] However, a designation of "elevated risk" does not constitute an imminent emergency. Rather, the WRA concludes that "the results of the probabilistic assessment reveal no [Expected Unserved Energy] or [Loss of Load Hours] for Winter 2025– 2026."[165]

Consistent with this assessment, none of the Craig Unit 1 Owners has indicated that they need Craig Unit 1 to mitigate any resource adequacy concerns this winter. None of the NERC assessments, whether cited by the Order or not, provide substantial evidence of an energy emergency in the WECC-Northwest region.

ii.     *WECC's Western Assessment of Resource Adequacy and the Department's Resource Adequacy Report do not demonstrate an emergency.*

The Order also cites the 2024 WECC Western Assessment of Resource Adequacy ("2024 WECC Assessment") to support its declaration of an emergency. Like the 2024 LTRA that the Order cites, the 2024 WECC Assessment does not analyze near-term resource adequacy, and instead uses a probabilistic approach to evaluate reliability over the next ten years.[166] This makes the 2024 WECC Assessment inappropriate for providing evidence of an emergency under Section 202(c).

---

[164] *Id.,* at 6.
[165] *Id.,* Table 5: Probability-Based Risk Assessment, at 14 (emphasis added).
[166] WARA, *Western Assessment of Resource Adequacy 2024*.

Even if the 2024 WECC Assessment was appropriate evidence for the Department to rely upon, it does not demonstrate an emergency in the areas served by Craig Unit 1. Once again, the Department selectively cites information in that report showing that peak demand is expected to grow and that there are planned baseload generation retirements, but ignores that this assessment finds no near-term energy emergency in any of WECC's regions. [167] In fact, the 2024 WECC Assessment finds that entities in the Western Interconnection plan to add more than 172 GW of new generation capacity in the next ten years, while a mere 25.85 GW of generation is planned to retire over the same period.[168] WECC's Northwest-Central subregion, which includes Colorado, whose load growth the Order specifically mentions, does not have demand at risk hours until 2031, and then only in a scenario where merely 55% of planned additions are completed and operational on time.[169] The 2024 WECC Assessment does not provide substantial evidence of an emergency in the areas served by Craig Unit 1.

Next, the Order briefly references the Department's Resource Adequacy Report,[170] which purports to provide a uniform methodology for identifying at-risk regions and grid reliability issues and guide reliability interventions. As with other reports cited in the Order, this Report provides no support for the Department's determination that there is an emergency requiring continued availability of Craig Unit 1 in the next 90 days, or even the next year. The Report assesses the ability of

---

[167] Exhibit A, at 2.
[168] WARA, *Western Assessment of Resource Adequacy 2024*.
[169] *Id.*
[170] Exhibit M.

the electric grid to "meet *future* demand through 2030" and is a "*forward-looking* snapshot of resource adequacy."[171] This Report was not designed to assess imminent emergency conditions of the electric grid, and explicitly does not do so.

Indeed, the Report's only conclusions are for 2030, which is completely irrelevant for an emergency Section 202(c) order issued in 2025. The Report finds potential reliability issues in 2030 only under a set of unsupported assumptions that assume unrealistically high load projections stemming from unfounded assumptions about data center load, and assume that utilities virtually cease construction of new generation and transmission resources. Its 2030 projections are at odds with the analyses from NERC and WECC, as well as the findings from Colorado's ERP proceedings and resource adequacy reporting. In any case, a claimed reliability issue in 2030 can not justify a 90 day emergency order in 2026. Forcing ratepayers to pay to keep generation online that is not needed, simply because technology companies may be building more data centers in the future that may need power is arbitrary and violates the FPA's requirement that rates be just and reasonable, especially as other analyses indicate that data center projections may be overblown.[172]

Given its focus on future conditions and unverified assumptions, the Report is not substantial evidence of an emergency under Section 202(c).

---

[171] Department, *Resource Adequacy Report Evaluating the Reliability and Security of the United States Electric Grid* (July 2025) at 9 (emphasis added).

[172] Exhibit SS (Behr, P., *PJM to ratchet down projected AI power demand for eastern US* (Jan. 6 , 2026)); Institute for Policy Integrity, *Fiscal Year 2025 Annual Report*; London Economics International LLC, *Uncertainty and Upward Bias are Inherent in Data center Electricity Demand Projections* (July 7, 2025).

> iii. *State planning processes have assured that the areas served by Craig Unit 1 have sufficient capacity currently and will continue to have sufficient capacity without Craig Unit 1.*

The Order notes that Colorado has retired 571.3 MW of coal generating capacity since 2019. However, the Order does not provide any evidence that these retirements have resulted in a resource shortfall in Colorado. The Order also ignores the rest of the states that are served by Craig Unit 1. All five of the Craig Unit 1 Owners' service areas have sufficient capacity for 2026-2030, well beyond the 90 day period covered by the Order, and do not need energy from Craig Unit 1 to maintain resource adequacy or reliability. Pursuant to the authority reserved to the states by the FPA, Colorado, Arizona, Wyoming, and Utah have robust electric resource planning processes that ensure resource adequacy and grid reliability. None of these states are currently part of an RTO or ISO, and therefore their electric grid is mainly managed by individual utilities and overseen by states and balancing authorities.

### a. Colorado's robust planning process ensures sufficient capacity for the State's utility customers.

For decades, Colorado has implemented robust and successful electric resource planning processes that serve as a model for other states. Colorado's process assesses resource adequacy and reliability across utilities' service territories, requires regulated utilities to use competitive resource solicitations to acquire new resources of multiple fuel types, and ensures that there will be sufficient electricity to meet expected load, even with planned plant closures.[173]

---

[173] Exhibit C.

As part of Colorado's overall energy planning framework, each investor-owned retail electric utility and wholesale electric generation and transmission cooperative is required to submit to the CoPUC an application for approval of an ERP.[174] Each Colorado ERP proceeding thoroughly considers resource adequacy and reliability at multiple stages.[175] In developing their forecasted resource needs, utilities' electric energy and demand forecasts must be completed for each year within the ERP planning period and must include, among other components, the electric demand placed on the utility's system for each hour of the day for peak-day, average-day, and representative off-peak days for each calendar month.[176] Utilities must "develop and justify a range of forecasts of coincident summer and winter peak demand and energy sales that its system may reasonably be required to serve during the planning period[,] . . . . including base case, high, and low" demand growth scenarios.[177] Since the announcement of Craig Unit 1's retirement in 2016, the CoPUC has received annual resource planning reports from Tri-State and Public Service, and has conducted two adjudicated resource planning proceedings for Tri-State's system and three for Public Service's system, with administrative records totaling in the tens of thousands or hundreds of thousands of pages. All of these proceedings have included the planned Craig Unit 1 retirement as a foundational assumption in forecasting, modeling, and portfolio selection.

---

[174] § 40-2-125.5, Colo. Rev. Stat.; 4 Colo. Code Regs. §§ 723-3-3603(a), -3605(a).
[175] Exhibit C.
[176] 4 Colo. Code Regs. § 723-3-3605(b).
[177] *Id.* at -(b)(II).

In an ERP proceeding, the utility must describe and justify the means by which it assesses the desired level of system reliability, and it must propose target planning reserve margins for each forecasted scenario.[178] Utilities' planning reserve margin studies employ probabilistic modeling to determine the amount of capacity necessary to maintain a certain level of reliability, for example a Loss of Load Expectation of 0.1 days/year. The studies must account for a wide variety of risks, "includ[ing] risks associated with: the development of generation; losses of generation capacity . . . ., losses of transmission capability; [and] risks due to known or reasonably expected changes in environmental regulatory requirements[.][179] Planning reserve margin studies also rely on thorough analyses, for each resource type, of the Effective Load Carrying Capability ("ELCC"), or the amount of dependable capacity that can be counted on by the system for resource adequacy purposes.[180] Utilities are also required to present contingency plans for the acquisition of additional resources in the event demand increases or expected generation resources are not developed.[181] Following extensive stakeholder input and vetting through rounds of testimony and cross-examination of utility's need for additional generation to be acquired through an all-source competitive resource solicitation.[182] The additional generation must be able to meet system needs, including availability or dispatchability at certain hours of the day.[183]

---

[178] 4 Colo. Code Regs. § 723-3-3605(e).
[179] *Id*. at -(e)(II).
[180] Exhibit C.
[181] 4 Colo. Code Regs. § 723-3-3605(e)(III).
[182] Exhibit C.
[183] *Id*.

Upon completion of a resource solicitation, the utility presents a number of potential resource portfolios. Included in this presentation are the results of additional reliability checks, which further ensure resource adequacy and reliability by demonstrating that each portfolio satisfies relevant metrics such as meeting the required planning reserve margin, meeting a Loss of Load Hours target and meeting an Annual Expected Unserved Energy target.[184] After opportunities for stakeholder input, the CoPUC issues a decision establishing the final cost-effective resource plan. In making this decision the CoPUC considers various statutory factors, including whether the resource plan meets the energy policy goals of Colorado, such as giving full consideration to cost-effective resources that provide beneficial contributions to Colorado's energy security, economic prosperity, environmental protection, and insulation from fuel price increases.[185]

    b.  <u>Tri-State's ERP demonstrates a reliable resource portfolio after Craig Unit 1's retirement.</u>

Tri-State's most recent electric resource proceeding[186] concluded in August 2025 with the selection of Tri-State's preferred resource portfolio as the approved cost effective resource plan.[187] The portfolio includes the addition of 700 MW of wind and solar, 650 MW of storage, and 307 MW of gas between 2026-2031, replaces the turbines on one of Tri-State's gas plants to improve its capacity contributions, and maintains the retirement dates of three coal plants (including Craig Unit 1).[188] Tri-

---

[184] *E.g.*, Exhibit J, at 94-95.
[185] 4 Colo. Code Regs. § 723-3-3605(h); § 40-2-134, Colo. Rev. Stat.
[186] Tri-State's planning processes encompass all states in its service territory, including Wyoming and Colorado. *See* Exhibit X, at 6.
[187] Exhibit E, ¶ 90.
[188] Exhibit X, at 6.

State demonstrated that the portfolio meets all reliability metrics, and avoids costly transmission upgrades required by other analyzed portfolios.[189] Tri-State remains in a capacity-long position until 2030 but has planned on the above resource acquisitions to ensure reliability as its coal units retire in 2025, 2028, and 2030 and to maintain progress toward emissions reductions.[190]

Tri-State supported each of the considered resource portfolios with two levels of rigorous reliability metric checks. The first level, intended to meet industry standards, required each portfolio's satisfaction of: (1) the target planning reserve margin for each year in the resource acquisition period, or 22% transitioning to 30.5% in 2028; (2) a Loss of Load Hours maximum of 1 day in 10 years and a maximum of 2.4 hours annually; and (3) an Expected Unserved Energy maximum of less than or equal to 0.4 Gigawatt hours ("GWh") annually.[191] The second level of reliability metrics was applied to the extreme weather event sensitivities to ensure reliable service during likely future weather events, and required that this modeled sensitivity for each portfolio resulted in: (1) no more than 12 hours of expected unserved energy during all extreme weather events modeled in the years 2026-2031; (2) no more than 3 Loss of Load Hours per each year in the years 2026-2031; (3) and an Expected Unserved Energy maximum of 20% of load in any hour.[192] Tri-State demonstrated that each presented resource portfolio met these reliability metrics. For the portfolio approved by the CoPUC, planning reserve margins ranged from 24% in 2025 to 34% in 2031, with

---

[189] Exhibit J.

[190] Exhibit W (CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Lisa K. Tiffin, Rev. 1, filed on May 15, 2024, in Proceeding No. 23A-0585E), at 30:15-16.

[191] Exhibit J, at 18.

[192] *Id.*; Exhibit W.

zero Loss of Load Hours and zero annual expected unserved energy during that period.[193]

Tri-State initially proposed the planning reserve margin targets satisfied by each portfolio through a detailed analysis of grid parameters, including the reliability needs of a system transitioning away from coal generation and toward increased reliance on renewables. ELCCs were determined for each resource type to appropriately model each resource's capacity potential for the specifics of Tri-State's system, rather than relying on nameplate capacity.[194] Incorporating these ELCCs and the reliability standard of 0.1 Loss of Load Expectation, Tri-State proposed that after the retirement of the Craig Station and the departure of certain member loads in 2028, the target planning reserve margin be 30.5%, which is considerably higher than its existing and historic reserve margin.[195] These planning reserve margins were carried through to Tri-State's portfolio approved in August 2025.[196]

In summary, every portfolio that Tri-State modeled in its most recent ERP assumed the retirement of Craig Unit 1 at the end of 2025, and every modeled portfolio met all reliability metrics, including Tri-State's approved portfolio.[197] And as specifically found by the CoPUC in its decision approving Tri-State's preferred

---

[193] Exhibit J, at 62.
[194] Exhibit OO (CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Lisa K. Tiffin, Rev. 1, filed on May 15, 2024, in Proceeding No. 23A-0585E, Attachment LKT-1 – Attachment G-1 (Astrape Consulting, Reserve Margin and ELCC Study, Public (Aug. 2, 2023)), at 8.
[195] *Id.*
[196] Exhibit W, at 20:8-15; Exhibit E.
[197] Exhibit J, Table 7: Modeled Retirements (Portfolio 1 - NEE), at 21, Table 32: Social Cost of Methane Nominal Dollars – System Wide (Portfolio 2 – NELG), at 35, Table 28: Modeled Retirements (Portfolio 2 – NELG), at 32, Table 49: Modeled Retirements (Portfolio 3 – FLEX), at 43, Table 70: Modeled Retirements (Portfolio 4 – FLEXSR), at 54, Table 91: Modeled Retirements (Portfolio 5 – NNG), at 75, Table 112: Modeled Retirements (Portfolio 6 – NNGSR), at 75.

portfolio, "Craig Unit 1 is not required for reliability or resource adequacy purposes based on the record in this ERP."[198] Tri-State's most recent ERP progress report, filed on December 1, 2025, confirms that it is progressing with contracting for its preferred portfolio resources, and using its updated load forecast, it does not forecast a capacity shortfall until 2035.[199]

    c.  <u>Colorado's process allows the State to quickly address changes in resource needs.</u>

Utilities must file annual progress reports on their efforts to implement approved plans and on their emerging resource needs, including an updated forecast, updated evaluations of planning reserve margins and contingency plans, and updated assessments of additional resource needs.[200] And importantly, Colorado's electric resource planning process also allows for the filing of interim ERPs and certificates of public convenience and necessity to fill generation needs not identified or fully satisfied by ERPs completed on the regular cadence.[201] This allows electric utilities and the State to quickly respond to changes in load or available resources.[202]

For example, Public Service filed a Just Transition Solicitation Plan, treated as an interim ERP, on October 15, 2024. The CoPUC issued a Phase 1 decision on November 6, 2025, that approved the Company's ERP and established a pathway for Public Service to acquire necessary generation and storage resources and reliably

---

[198] Exhibit E, ¶ 116.
[199] Exhibit Z (CoPUC, Tri-State, 2025 Annual Progress Report, filed on December 1, 2025, in Proceeding No. 23A-0585E), at 8, 10-11.
[200] 4 Colo. Code Regs. § 723-3-3618.
[201] 4 Colo. Code Regs. §§ 723-3-3603(a), 3605(a)(II); Exhibit C.
[202] *Id.*

serve existing and future customers.[203] Like Tri-State, Public Service has filed

previous ERPs that all accounted for the retirement of Craig Unit 1.[204]

Public Service has not indicated a need for energy from Craig Unit 1 to meet

any immediate or longer-term resource needs. Public Service's ERPs demonstrate it is

not anticipated to have a shortfall in the next 90 days, as Public Service is a summer

peaking system. In recent filings before the CoPUC, Public Service raised some

concerns for the summers of 2026 and 2027, which do not begin for another six

months. Colorado is already acting to address Public Service's concerns. In December

2025, the CoPUC approved an extension of the retirement date for a Public Service

coal plant located in Pueblo, finding that the delay of the planned Comanche Unit 2

retirement date until December 31, 2026, is necessary due to the unplanned outage

of another coal unit, Comanche Unit 3.[205] Public Service is also engaging in a near-

term procurement process within an older ERP proceeding to acquire additional

resources to be deployed prior to 2031.[206] Thus, Colorado has flexible procedures that

assure resource adequacy in the State, even when there are unforeseen events.

---

[203] CoPUC, Decision No. C25-0747, issued on November 6, 2025, in Proceeding No. 24A-0442E, ¶ 2.
[204] Exhibit C, ¶¶ 27-31.
[205] Exhibit BB, (CoPUC, Decision No. C25-0892, issued on December 10, 2020, in Proceeding No. 25V-0480E), ¶ 65. On November 10, 2025, the Colorado Energy Office, Trial Staff of the Public Utilities Commission, the Colorado Office of the Utility Consumer Advocate, and Public Service submitted a petition to the CoPUC requesting that a coal plant, Comanche Unit 2, which was also scheduled to retire on December 31, 2025, remain open for another year. *See* Exhibit Y (CoPUC, *Verified Petition of Trial Staff of the Commission, Colorado Energy Office, the Colorado Office of the Utility Consumer Advocate, and Public Service for a Variance from Decision No. C18-0761 and Any Other Requirements, Request for Shortened Notice and Intervention Period, and Request for Approval of Associated Procedures,* filed on November 10, 2025, in Proceeding No. 25V-0480E).
[206] Exhibit N.

PRPA, though not overseen by the CoPUC, develops an Integrated Resource Plan ("IRP") to conduct long-term resource planning and ensure resource adequacy.[207] PRPA ran all of its scenarios to meet a planning reserve margin of 19.9%.[208] With its current and committed resources, PRPA has enough capacity to maintain a 19.9% planning reserve margin through 2029.[209] PRPA began commercial operation of a 150 MW solar project in 2025,[210] plans to begin a 130 MW solar project in 2027, and is beginning processes to obtain additional dispatchable capacity.[211] PRPA has no resource adequacy issues now or forecasted upon the retirement of Craig Unit 1. As shown by its annual required filing with the Colorado Energy Office, its capacity well exceeds forecasted demand with a total accredited capacity of 885 MW and a native load forecast of 722 MW for 2026, leading to a planning reserve margin of 25.4%.[212] PRPA's General Manager and CEO has publicly stated that the utility does "not need the Craig 1 unit because it has already replaced the energy that came from it."[213]

> d. The other states served by Craig Unit 1 also oversee resource planning to ensure reliability and adequate capacity.

Although the majority of Craig Unit 1's energy serves Colorado, and Colorado is the only state the Order specifically discusses, Utah and Arizona also receive energy from Craig Unit 1, through PacifiCorp and Arizona respectively. Each of these states has extensive resource planning processes.

---

[207] Exhibit EE.
[208] *Id.*
[209] *Id.*
[210] PRPA, *Solar Energy* (2026).
[211] Exhibit EE, at 178.
[212] PRPA, *Worksheet Certification Form* (Apr. 28, 2025).
[213] Exhibit RR (Powell, R., *1 coal plant open amid order* (Jan. 6, 2026)) at 3.

The Utah Public Service Commission ("Utah PSC") has the power to supervise and regulate every public utility in Utah.[214] The Utah PSC regulates IRPs, including PacifiCorp's IRPs.[215] Utah utilities are also required to maintain a written reliability program.[216] PacifiCorp has a 2025 IRP that is specific to Utah, which Colorado understands to be the part of PacifiCorp's service territory that is sometimes served by Craig Unit 1's energy.[217] That IRP indicates that PacifiCorp expects to acquire 6,379 MW of new wind resources, 7,668 MW of storage resource, 5,492 MW of solar, and 500 MW of nuclear.[218] Currently, PacifiCorp owns 11,700 MW of generation capacity, meaning that its 82 MW from Craig Unit 1 makes up 0.7% of its generation capacity.[219] PacifiCorp acknowledges that coal resources have been an important resource in its portfolio in the past, but material changes in how PacifiCorp operates those assets has enabled the company to reduce fuel consumption and associated costs and emissions, and instead buy increasingly low cost zero emission renewable energy from market participants.[220] PacifiCorp is well above its winter system capacity planning reserve margin of 16.8% through 2028[221] and has expressed no need to keep Craig Unit 1 online.

[214] <u>Utah Code Ann</u>. § 54-4-S1 (2024).
[215] Utah Code Ann. § 54-17-301 (2025).
[216] Utah Admin. Code R746-313-4 (2025).
[217] Exhibit GG (PacifiCorp, *Utah Integrated Resource Plan Volume I* (Mar. 31, 2025)).
[218] *Id.* at 37.
[219] PacificCorp, *Powering a bright future* (2026).
[220] Exhibit GG.
[221] *Id.* at 265.

The Arizona Corporation Commission ("ACC") oversees the electric power industry in Arizona.[222] Load-serving entities, including Salt River Project, are required to annually file demand and supply side data, a forecast of peak load, and a 15-year resource plan that "[w]ill result in the load-serving entity's reliably serving the demand for electric energy services," with the ACC.[223] The Salt River Project conducts long-term resource planning to anticipate and meet future needs, most recently through their 2023 Integrated System Plan ("ISP"),[224] where the Salt River Project modeled multiple future scenarios to ensure that it would be resource adequate through 2035. The ISP plans for new resource acquisitions and accounts for all coal plant retirements. The ISP had all scenarios except two meet their requisite 16% planning reserve margin. The two scenarios that did not meet the PRM are more extreme scenarios where firm resource options are limited and there is accelerated load growth, but even in those two cases reliability would not be compromised until 2028.[225] Salt River Project did not pursue analysis of those scenarios, since they are not viable due to not achieving the planned reserve margin, even as far out as 2028.[226] Neither the ACC nor the Salt River Project have expressed concerns about resource adequacy and have been strategically planning for coal unit retirements. Salt River Project has construction "underway for 575 MW of new flexible natural gas resources . . . . and 55 MW of solar" and "is finalizing agreements for 480 MW of [additional] solar and 1300 MW of battery storage projects."[227] Further, Salt River Project receives its energy from Craig Unit 1 through an exchange with WAPA, where WAPA makes the necessary transmission available. However, that arrangement

terminates on April 1, 2026, and it is unclear how Salt River Project would get energy from Craig Unit 1 after that date.

The extensive planning processes conducted by the owners of Craig Unit 1 have ensured that the unit's retirement will not negatively impact the reliability of any of their electric grids. All of the utilities are resource adequate for the 90 days covered by the Order and none of them have expressed a need for Craig Unit 1.

e. FERC's oversight ensures reliability at the regional level.

In addition to these extensive state processes developed under the states' sovereign authority, the Craig Unit 1 Owners are all overseen by a variety of authorities, acting under FERC's delegated authority. As noted above, the FPA places this authority with FERC and does not provide any authority for oversight of long-term resource planning to the Department in Section 202(c). The FERC and state processes work together to ensure reliability, and the Order illegally intrudes on these processes without any reasonable basis.

The Order instructs Craig Unit 1 to be available to operate at the direction of SPP or WACM.[228] SPP is the reliability coordinator for Tri-State, PRPA, and Public Service.[229] SPP has been a reliability coordinator for over 20 years and has extensive operating criteria, outage coordination methodology, and emergency protocols.[230] SPP

[222] ACC, *Utilities Division*.
[223] Ariz. Admin. Code R14-2-703.F.2. (2025).
[224] Exhibit H.
[225] *Id.,* at 104-105.
[226] *Id.*
[227] SRP, *Integrated System Plan: ISP Actions Progress Report 2025* at 7.
[228] Exhibit A.
[229] SPP, *Western RC Services* (2026).
[230] SPP, *Operating Reliability* (2026).

has a Reliability Plan that details how it monitors for and responds to an emergency.[231] Like all Reliability Coordinators, SPP has "a wide-area view, operating tools, processes and procedures to prevent or mitigate emergency operating situations in next day analysis and real-time conditions[]" and has the authority to act and instruct its members to take actions to preserve the integrity and reliability of the bulk electric system.[232] Likewise, balancing authorities ensure that power system demand and supply are balanced and are responsible for maintaining operating conditions under mandatory NERC reliability standards.[233] WACM is a Balancing Authority overseen by SPP as a reliability coordinator.[234]

An energy emergency is defined by NERC and WECC as a situation when a load serving entity has exhausted all options for obtaining capacity and can no longer provide its customers with expected energy requirements.[235] A reliability coordinator will initiate an energy emergency alert at their own request, upon the request of a Balancing Authority, or upon the request of a load serving entity.[236] Reliability Coordinators and balancing authorities make the decision to call or request the calling

---

[231] Exhibit HH (SPP, *SPP Reliability Plan* (Jun 2, 2025)).
[232] *Id.,* at 6-7.
[233] Department, *Learning Series: Energy Security & Resilience*.
[234] SPP, *Western RC Services* (2026).
[235] WECC, *Standard EOP-002-2 - Capacity and Energy Emergencies* (2007).
[236] *Id.* At an Energy Emergency Alert Level 1, a Balancing Authority will call on all available power supplies, regardless of economics, including from other grids, and enable demand-side resource deployments.# At an Energy Emergency Alert Level 2, a Balancing Authority will initiate demand response programs that shed load from large industrial customers that have contractually agreed to do so and will publicly appeal to customers to cut back on electricity consumption.# If the highest level of emergency, Energy Emergency Alert Level 3, is called, then Reliability Coordinators will conduct emergency operating procedures to increase transfer capabilities into the entity declaring the emergency. NERC has general emergency operating instructions that address the effects of emergencies by ensuring each transmission operator and Balancing Authority has developed plans to mitigate operating emergencies and those plans are implemented and coordinated within the reliability coordinator. Exhibit II (NERC, Emergency Operations).

of an emergency pursuant to their emergency plans and operating procedures. WACM and SPP have not done so in this case, despite having the same (or likely more) information as the Department does about the reliability of the grid in the areas served by Craig Unit 1.

Therefore, if an emergency did occur in the areas served by Craig Unit 1 or in the WECC-Northwest assessment area, there are extensive procedures in place for that emergency to be handled by the complex and comprehensive network of the utilities themselves, Reliability Coordinators, and balancing authorities without the Department overstepping and preemptively trying to solve an emergency that has not occurred, and is not predicted to occur in any relevant assessment. The Order states merely that there is an emergency in the WECC-Northwest assessment area because of increasing peak demand and baseload generation retirements, without actually citing any reliability issues that have stemmed from those conditions. There is no evidence, and the Order cites none, that an emergency within the WECC system could not be handled by WECC's existing procedures and the existing mix of resources available in the region upon Craig Unit 1's retirement.

> iv. *The Executive Orders cited in the Order are not evidence of an energy emergency.*

The Order also relies on the Energy Emergency and Grid Reliability Executive Orders as evidence of an energy emergency, generally stating that the Energy Emergency and Grid Reliability Executive Orders underscore the energy challenges facing the Nation due to growing resource adequacy concerns.[237] However, neither of

---

[237] Exhibit A.

these executive orders present evidence of an energy emergency in the WECC-Northwest Assessment Area or any other region of the county within the meaning of Section 202(c).[238]

On January 20, 2025, President Trump issued Executive Order 14156, *Declaring a National Energy Emergency* ("Energy Emergency Executive Order").[239] Despite its title, the Energy Emergency Executive Order fails to describe any type of energy emergency. It generically claims "[t]he energy … generation capacity of the United States [is] far too inadequate to meet our Nation's needs," and the situation "will dramatically deteriorate in the near future…"[240] The Energy Emergency Executive Order also specifically calls out the Northeast and West Coast states, claiming those states' "dangerous" "policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population."[241] The Executive Order does not identify any specific policies or explain how they are jeopardizing grid reliability.

President Trump then issued Executive Order 14262, *Strengthening the Reliability and Security of the United States Electric Grid*, ("Grid Reliability Executive Order") on April 8, 2025.[242] The Grid Executive Order also claims that the country is "experiencing an unprecedented surge in electricity demand," generically pointing to expansions of data centers and increases in domestic manufacturing as

---

[238] *See* 10 C.F.R. § 205.371 (defining emergency as a "specific inadequate power supply situation").
[239] Exec. Order 14156, 90 Fed. Reg. 8,433, 8,434 (Jan. 20, 2025).
[240] *Id.,* at Sec. 1.
[241] *Id.*, at 8,434.
[242] Exec. Order 14262, Strengthening the Reliability and Security of the United States Electric Grid, 90 Fed. Reg. 15,521 (April 14, 2025).

demand drivers.[243] These vague statements on nationwide energy needs are not sufficiently specific to justify a Section 202(c) order.

Neither of these Executive Orders provide data or other evidence in support of their claims of inadequate nationwide generation, let alone evidence of inadequate generation in the areas served by Craig Unit 1 such that they could constitute the evidence required to support the Order. The Energy Emergency Executive Order refers to a deterioration "in the near future,"[244] while the Grid Reliability Executive Order offers no projection for the timing or location of the increased demand it speculates.[245] This does not satisfy Section 202(c)'s requirements, discussed above in Section V.A., that an emergency must be specific and imminent.

Importantly, the facts contradict the vague assertions of an energy emergency contained in the Executive Orders. For example, America's domestic energy production is at an all-time high given its diverse mix of both fossil and non-fossil fuel resources. The United States is producing record quantities of oil and natural gas,[246] and has been a net energy exporter since 2019.[247]

Similarly, the Energy Emergency Executive Order's assertion that the United States has an "inadequate and intermittent energy supply, and an increasingly unreliable grid" is unsupported by the facts.[248] NERC reports that the bulk power

---

[243] *Id.*
[244] Exec. Order 14156, 90 Fed. Reg. at 8,433.
[245] Exec. Order 14262, Strengthening the Reliability and Security of the United States Electric Grid, 90 Fed. Reg. 15521 (Apr. 8, 2025).
[246] U.S. Energy Information Admin. ("EIA"), *Short-Term Energy Outlook Data Browser* (Jan. 13, 2026).
[247] EIA, *In-Brief Analysis: The United States was the world's largest liquified natural gas exporter in 2023* (Apr. 1, 2024); EIA, *U.S. Exports of Crude Oil* (Dec. 31, 2025); EIA, *U.S. Energy Facts Explained* (July 15, 2024).
[248] Exec. Order 14156, 90 Fed. Reg. at 8,433.

system is resilient, and that the largest challenge for reliability is extreme weather induced by climate change.[249] Renewable energy resources both mitigate climate change and improve the overall reliability and affordability of the United States' energy supply by tempering the impact of international commodity price swings on natural gas prices and reducing grid operators' reliance on interruptible natural gas deliveries.[250] Solar and wind generated more than 15% of all electricity and 8% of all energy consumed in the United States in 2024.[251]

Next, the Order relies in part on "the expansion of artificial intelligence data centers" referenced in the Grid Reliability Executive Order and other projected demand growth noted in the Department Resource Adequacy Report to support its finding of an emergency.[252] But the Order's discussion of data center load growth is both irrelevant and unsubstantiated.

Neither the Grid Reliability Executive Order nor the Order specify any timeframe for when the increased energy demand from data centers is expected to occur. Section 202(c) does not give the Department the authority to retain generation units for possible conditions that may arise at some indeterminate time in the future. Authority to address long-term threats to resource adequacy rests with the states and FERC and its designated entities, all of which are aware of and extensively planning for this potential load growth. The Order does not cite any evidence that data center

---

[249] NERC, *2024 State of Reliability* (June 2024), at 5.
[250] FERC, *The February 2021 Cold Weather Outages in Texas and the South Central United States* (Nov. 16, 2021), at 172 ("Natural gas fuel supply issues alone caused 27.3[%] of the generating unit outages" during Winter Storm Uri).
[251] EIA, *Short-Term Energy Outlook* (Feb. 11, 2025), *see* the 2024 data; EIA, *December 2025 Monthly Energy Review* (Dec. 23, 2025).
[252] Exhibit A, at 2-3.

load growth will occur in the areas served by Craig Unit 1 during the 90 day period of the Order. As demonstrated in their respective resource plans, the Craig Unit 1 owners are not anticipating any new data centers or other large loads over 50 MW to come online in their service territory in the next 90 days.[253] And where Colorado utilities anticipate data centers coming online in the next five years, they are planning for that additional load through their established resource planning processes.

**D.    The Order is arbitrary and capricious because it fails to require generation that best meets the claimed emergency.**

Even if there were an emergency within the meaning of the FPA, which there is not, Section 202(c)(1) requires the Department to impose requirements that "will best meet the emergency and serve the public interest."[254] The Department has failed to demonstrate that delaying the retirement of Craig Unit 1 satisfies this standard, and the Order is therefore arbitrary and capricious.

*i.    Preventing Craig Unit 1's retirement does not "meet the emergency," especially where the unit requires costly repairs.*

It is unclear how preventing Craig Unit 1's retirement could meet the emergency that the Department alleges. The nature and extent of the claimed emergency are unclear. And even if there were a capacity shortfall in any of the states served by Craig Unit 1 or the WECC-Northwest assessment area, the Order does not provide a reasoned basis for its conclusion that the continued operation of Craig

---

[253] *See* Section V.C.iii., supra.
[254] 16 U.S.C. § 824a(c)(1).

Unit 1 is the best or even a viable means of alleviating the purported shortfall, particularly in light of the costly repairs required to make Craig Unit 1 available.

The Department cannot demonstrate that Craig Unit 1's retirement meets the emergency because the Order's emergency declaration is unclear and unsupported by the record. The Order does not specify which version of the WECC-Northwest assessment area it is relying upon, which is essential because the assessment areas significantly changed after the 2024 LTRA assessment. This is further confused by the Order's next reference to the WECC-Northwest assessment area being that the "WECC[-]Northwest assessment area, which includes Colorado, Idaho, Montana, Oregon, Utah, Washington, and Wyoming..." despite the fact that in the 2024 LTRA, that assessment area also includes parts of California, Nebraska, Nevada, and South Dakota.[255] Regardless, assuming that the order only refers to the states it called out specifically, Colorado, Idaho, Montana, Oregon, Utah, Washington, and Wyoming, it is Colorado's understanding that Craig Unit 1 is only capable of serving three of those states. The Order also fails to demonstrate that there is a resource shortfall imminent and specific enough to require the continued operation of any particular resource. Thus, it is unclear how Craig Unit 1 could meet the Department's alleged emergency, regardless of how the Order's emergency determination is interpreted.

---

[255] Exhibit K, at 127.

     *ii.*     *Delaying the retirement of Craig Unit 1 does not "best" meet the Department's purported emergency.*

Even if delaying the retirement of Craig Unit 1 could meet the non-existent alleged emergency in the WECC-Northwest assessment area, the Department has provided no explanation of how that resource would best meet such an emergency. "Best" means "that which is 'most advantageous'" or "excelling all others."[256]

The Order, and the materials upon which it relies, offer no facts that would support a determination that Craig Unit 1 is the "most advantageous" way to address the alleged emergency. Even if the Order had successfully described an emergency scenario for the regions served by Craig Unit 1 or the WECC-Northwest assessment area, the Department has not provided any specific evidence or reasoning explaining why requiring Craig Unit 1 to be available to operate is the most advantageous way to meet the scenario. Other orders issued by the Department in 2025 suffer from the same flaw, as the Congressional Research Service identified in July 2025, noting that Orders issued to the Campbell and Eddystone units have not "identified reliability risks specifically associated with the retirement of the power plants in question at the time they approved those retirements."[257] In this respect, the Department's exercise of its emergency authority in 2025 departs markedly from past uses of Section 202(c) and from the Department's regulations implementing Section 202(c). Those

---

[256] *Entergy Corp.*, 556 U.S. at 218 (quoting Webster's New International Dictionary 258 (2d ed.1953)); *Best*, Merriam-Webster Dictionary (Jan. 25, 2026).
[257] Exhibit T (Congressional Research Service, Federal Power Act: The Department of Energy's Emergency Authority (June 12, 2025)), at 5-6.

regulations specify that: "[a]ctions under this authority are envisioned as meeting a specific inadequate power supply situation."[258]

"Best's" definition of "excelling all others" requires a comparative judgment that there are no better alternatives. This means the Department must consider alternatives and choose the alternative that is most advantageous to meet the emergency the Department has identified. The Department need not consider every conceivable alternative, but it must consider alternatives within the ambit of the existing policy as well as alternatives which are significant and viable or obvious.[259]

The Department's regulations specify information the Department must consider in deciding how to best address an emergency in a Section 202(c) order. This includes conservation or load reduction actions, efforts to obtain additional power through voluntary means, available imports, demand response, and behind the meter generation resources.[260] The Order considers none of these alternatives. Nor does it explain whether less burdensome measures were considered or exhausted before invoking the Department's emergency authority. Indeed, the Order never quantifies the extent of the emergency it purports to identify within Colorado or any of the states served by Craig Unit 1, making a meaningful alternatives analysis impossible. As discussed in Section V.B.iii, each of the areas served by Craig Unit 1 have significant planning reserve margins. To satisfy Section 202(c)(1)'s requirement that the ordered

---

[258] 10 C.F.R. § 205.371.
[259] *See Dep't of Homeland Sec.*, 591 U.S. at 30 (failure to consider alternative was arbitrary and capricious); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 51 (must consider alternatives "within the ambit of the existing [standard]").
[260] 10 C.F.R. § 205.373(g)-(h). While this information is specifically required when a utility applies for a 202(c) order, it illustrates the types of information that is relevant to an alternatives analysis.

solution best meet the emergency, the Order must address why the resources that make up the excess planned reserve margins could not meet the alleged emergency.

This is a particularly glaring omission because the Department addressed their alleged emergency by ordering an inoperable coal unit that required significant repairs to become available to operate,[261] despite the reserve capacity in the region. Craig Unit 1 experienced an outage on December 19, 2025, due to a mechanical valve failure.[262] The Unit was not repaired until January 20, 2025,[263] a third of the way into this 90 day order, and required spending significant resources that would not have been expended absent the Order.[264]

In addition to the significant cost just to make Craig Unit 1 available to operate after the valve failure, Tri-State has stated that retaining Unit 1 "will likely require additional investments in operations, repairs, maintenance and, potentially, fuel supply, all factors increasing costs."[265] The Craig Unit 1 Owners chose to retire Craig Unit 1 for economic reasons.[266] And because the unit was set to retire, Craig Unit 1 has not had major maintenance since 2019;[267] it is also 45 years old, beyond the typical economic design life of a coal burning generator and near the end of a

---

[261] *See* Exhibit B, ¶ 11.
[262] Tri-State, *U.S. DOE orders Tri-State to keep Craig Generating Station unit operating for next 90 days* (Dec. 31, 2025).
[263] Tri-State, *Tri-State makes Craig Generating Station Unit 1 available to operate in compliance with DOE emergency order* (Jan. 23, 2026).
[264] Tri-State, *U.S. DOE orders Tri-State to keep Craig Generating Station unit operating for next 90 days* (Dec. 31, 2025).
[265] *Id.*
[266] Tri-State, *Craig Station owners, regulators and environmental groups reach agreement on proposed revisions to Colorado regional haze plan* (Sept. 1, 2016).
[267] Exhibit B at ¶ 34.

generator's typical operational life.[268] Keeping Craig Unit 1 running will be more costly now because of the deferred maintenance costs in addition to costs for fuel and continued operations.[269] Colorado's understanding is that Tri-State has, since the issuance of the Order, already begun to expend costs on some of this maintenance.[270] These costs are currently unknown but expected to be significant. It is unclear how Tri-State and the other co-owners will recover these costs, but it is highly likely that they will seek to have ratepayers pay them.[271]

Complicating the fuel issue, Tri-State did not plan on continuing to acquire or use coal for Craig Unit 1 due to its scheduled retirement. Craig Station is supplied with coal from the Colowyo Mine, which ceased coal production at the end of 2025.[272] Tri-State has already contracted with Kiewit Mining Group, Inc., to reclaim the mine following its closure, and reclamation activities were scheduled to begin on or about January 1, 2026.[273] Moreover, the Colowyo mine has been sterilized, meaning it will not be reopened and its operator has transitioned to reclamation activities.[274] It is Colorado's understanding that before the mine's closure, Tri-State obtained enough coal to fuel Craig Units 2 and 3 through their planned retirement dates in 2028 but did not expect to need coal to power Craig Unit 1. If Tri-State needs to use coal acquired

---

[268] Grid Strategies, *The Economic Cost of a DOE Mandate for the Craig Unit 1 Coal-Burning Generator to Continue Operating* (Dec. 2025), at 2.

[269] Exhibit D ¶¶ 14-15.

[270] *See* Exhibit B, ¶ 34.

[271] Exhibit D ¶ 18.

[272] Jaffe, M., *Tri-State expects federal order to keep coal-fired power plant in northwestern Colorado running* (Nov. 14, 2025).

[273] Tri-State, *Colowyo Mine to conclude coal production in 2025, transitioning to full reclamation* (Aug. 7, 2025).

[274] Weiser, C., *Colowyo coal mine near Craig lays off 133 workers as mine closes* (Nov. 26, 2025); WarnTracker.com, *1 WARN Layoff Notice for ColoWho Coal Company LP on Nov 2025* (2025).

to fuel Craig Units 2 and 3 to unexpectedly fuel Craig Unit 1, it will likely not have enough supply to also fuel the other units. Tri-State would then have to buy more expensive, and possibly dirtier, coal from another source.[275]

In addition, coal generation is generally more costly than other generation resources.[276] The inefficiency of running a coal plant makes it uneconomic in general and is the main reason that Craig Unit 1 (and eventually, the rest of Craig Station) was slated for retirement. In fact, the CoPUC approved coal fired generating unit retirements to be replaced with lower cost wind, solar, and use of gas as a capacity resource because wind and solar were the lowest cost resources available and it was cheaper to add new renewables, storage and gas generation to the system and retire coal units.[277]

Coal generation also does not guarantee reliability, which further emphasizes that Craig Unit 1 would not best meet any emergency. A 2021 report by the CoPUC found that Comanche Unit 3, Colorado's newest coal plant, which supplies portions of Public Service's territory, averaged 91.3 days per year of outages and was out of

---

[275] *See* Exhibit B, ¶ 32.

[276] Weiser, C., *Colowyo coal mine near Craig lays off 133 workers as mine closes* (Nov. 26, 2025). A report by Grid Strategies found that ratepayer costs could exceed $3 billion per year if the Department mandates that all of the fossil power plants scheduled to retire between the time the report was published in August 2025 and the end of 2028 remain open. Grid Strategies asserts that the Department is ignoring the careful planning of states and utilities and "overriding cost-minimizing retirement decisions that have been made by state utility regulators and merchant power plant owners based on extensive information regarding the cost, performance, condition, and need for each plant." *see also* Grid Strategies, LLC, *The Cost of Federal Mandates to Retain Fossil-Burning Power Plants* (Aug. 2025) at 3; Exhibit O, which cost a staggering $29 million over the first 38 days; Solomon, M., et al., *Coal Cost Crossover 3.0: Local Renewables Plus Storage Create New Opportunities for Customer Savings and Community Reinvestment* (Jan. 2023), at 1-2 (a report by Energy Innovation found that "99[%] of all coal-fired plants in the U.S. are more expensive to operate on a forward looking basis than the all-in cost of renewable energy projects," and that "all but one of the country's 210 coal plants are more expensive to operate than either new wind or solar.").

[277] CoPUC, Decision No. C18-0761, issued on September 10, 2018, in Proceeding No. 16A-0396E, ¶ 103.

service for nearly all of 2020.[278] In fact, when Public Service experienced a supply constraint in Summer of 2025, 80% of its unavailable power was caused by coal unit outages.[279]

This is not just true in Colorado, but also in other states, yet the Department has ignored this reality in issuing Section 202(c) orders. For example, the R.M. Schahfer Generating Station has been in a forced outage since July, after experiencing another forced outage from February 16, 2025 to June 23, 2025.[280] Yet, despite the unit being offline, the Department issued an order requiring it to remain available on December 23, 2025.[281] Finally, the newest large coal-fired plant in the U.S. suffered an outage in fall of 2025 and will now be offline until March 2027.[282] This is the second time that plant has been unable to operate for a year or more.

These facts illustrate a clear pattern: coal is not the first choice when considering reliable, affordable generation. And the Order contains no facts (either in its text or in the cited materials) that supports any determination that ordering continued availability and operation of an off-line coal unit is a reasonable response to a perceived emergency, much less "best meets" such an emergency. Given the cost of Craig Unit 1 and questions of reliability surrounding coal plants generally, the

---

[278] Kohler, J., *Comanche 3, Xcel Energy's troubled coal plant, likely out of commission for months* (Oct. 24, 2025); CoPUC, *Staff Report Volume 1,* Public, filed on March 1, 2021, in Proceeding 20I-0437E, at 65.
[279] Kohler, J., *Comanche 3, Xcel Energy's troubled coal plant, likely out of commission for months* (Oct. 24, 2025).
[280] *Id.*
[281] Exhibit S.
[282] Institute for Energy Economics and Financial Analysis, *Newest big U.S. coal-plant offline until 2027* (Oct. 7, 2025); Tri-State, *Tri-State makes Craig Generating Station Unit 1 available to operate in compliance with DOE emergency order* (Jan. 23, 2026).

Department has failed to demonstrate that Craig Unit 1's continued operation "best meets the emergency" and therefore the Order is arbitrary and capricious

**E.       The Order's terms fail to comply with Section 202(c)'s requirements.**

*i.       The Order is contrary to law because it attempts to regulate a generation facility by requiring the Craig Unit 1 Owners to undertake substantial and expensive repairs that they otherwise would not conduct.*

Given that Craig Unit 1 was offline at the time the Order was issued, compliance with the Order required the repair of Craig Unit 1.[283] This requirement is outside the scope of the Department's Section 202(c) authority, even if there was adequate proof of an energy emergency.

The Department's emergency power under Section 202(c) is bounded both by the provision's specific language and Congress's clear, repeated direction in the FPA to respect the states' authority over generating facilities. When an actual emergency exists, Section 202(c)(1) authorizes the Department to require just two specific things: (1) "temporary connection of facilities" and (2) "generation, delivery, interchange, or transmission of electric energy."[284] The only reference to "facilities" in the authorizing provision of Section 202(c)(1) appears in the clause relating to temporary connections, not in the clause pertaining to "generation" of electric energy. And that clause authorizes only "connections" of facilities: it does not provide authority to regulate the individual facilities. The difference in Congress's

---

[283] Exhibit B, ¶ 11; Tri-State, *Tri-State makes Craig Generating Station Unit 1 available to operate in compliance with DOE emergency order* (Jan. 23, 2026).
[284] 16 U.S.C. § 824a(c)(1).

word choice in these clauses – referencing "facilities" in one authorizing provision but not the other – must be given effect.[285]

As discussed above in Section V.C.i., Section 201(b)(1) of the FPA specifically states that unless otherwise provided, there is no federal jurisdiction over "facilities used for the generation of electric energy." Courts have also held that Section 201(b)(1) reserves authority over electric generating authority to the states, reiterating that states retain the right "to require the retirement of existing generators."[286] Given Congress's use of the term "generating facilities" elsewhere in the statute, if it had intended to give the Department authority in Section 202(c)(1) over generating facilities that otherwise resides with the states, it would have had to do so explicitly.[287] Instead, the provision conspicuously excludes authority to manage the physical characteristics of power plants.

Thus, Congress purposely limited and particularized the Department's emergency powers, carefully avoiding intrusion on the states' authority over generating facilities recognized in Section 201(b)(1). As stated in the legislative history, the emergency powers in Section 202(c)(1) "which were indefinite in the original bill have been spelled out with particularity."[288] The Department may neither directly regulate generation facilities nor impose requirements aimed at the facilities,

---

[285] *See e.g. Gallardo v. Marstiller*, 596 U.S. 420, 430 (2022); *see also Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008).

[286] *Conn. Dep't of Pub. Util.*, 569 F.3d at 481; *see also, e.g., Hughes*, 578 U.S. at 155.

[287] *Gregory,* 501 U.S. at 460 (The clear statement rule requires Congress to make its intent unmistakably clear if it intends a statute to alter the usual constitutional balance between the federal government and the states.); *see also DeMarco*, 4 F.3d at 169 (Congress must express an affirmative intention to use a statute to alter the federal balance.)

[288] *See* S. Rep. No. 74-621, at 19 (1935).

even if nominally regulating within its sphere.[289] This means that the Department may not require generation that necessitates the utility taking steps reserved to state authority, such as building a new generating unit or refurbishing a broken one. Therefore, the Order is outside the bounds of its Section 202(c) authority even if there is an emergency, because it managed the physical characteristics of Craig Unit 1 by requiring its repair.

> ii. *The Order violates Section 202(c)(2) because it fails to ensure consistency with federal and state environmental laws and fails to minimize adverse environmental impacts.*

Section 202(c)(2) imposes mandatory duties on the Department if a 202(c) order "may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation[.]"[290] The Order explicitly conflicts with the environmental laws and regulations that apply to the Craig Station Unit 1 Owners, and may also result in additional conflicts with environmental laws and regulations that apply to the State of Colorado.[291] The Department failed to comply with these requirements, rendering the Order illegal.

> a. <u>The Order directly conflicts with federal and state laws requiring Craig Unit 1 to close by December 31, 2025.</u>

The Order directly conflicts with federal and state environmental laws and regulations that require the closure of Craig Unit 1 by December 31, 2025. These include Colorado Air Quality Control Commission ("AQCC") Regulation Number 23,

---

[289] *See F.E.R.C. v. Elec. Power Supply Ass'n,* 577 U.S. 260, 281-82 (2016); *see also Hughes,* 578 U.S. at 164-65.
[290] 16 U.S.C. § 824a(c)(2) (emphasis added).
[291] *See* Exhibit B.

Colorado's Regional Haze SIP adopted pursuant to the Federal Clean Air Act, and Tri-State's operating permit issued pursuant to Title V of the Federal Clean Air Act.[292]

The AQCC (with the Craig Station owners' consent) adopted the December 31, 2025 closure date into state law through Regulation Number 23, which regulates regional haze.[293] The EPA then approved this closure date into federal law when it approved Colorado's Regional Haze SIP in 2018.[294] In addition, Craig Unit 1 is a major source of air pollution[295] and therefore requires, and operates under, an operating permit issued pursuant to Title V of the Federal Clean Air Act.[296] A Title V permit includes emissions limits, operational requirements, reporting obligations, and other requirements to ensure the safe and environmentally responsible operation of major sources. Condition 1.10 of Craig Unit 1's operating permit specifies that the Unit must close on or before December 31, 2025.[297]

In addition, the Colorado Legislature directed the AQCC to adopt rules to help meet statewide statutory GHG reduction goals.[298] The Order's direction for continued availability and operation of Craig Unit 1 may restrict Colorado's ability to meet these statutory goals.

---

[292] *Id.*

[293] *See* 5 Colo. Code Reg. § 1001-27:A.IV.D.

[294] Air Plan Disapproval; Colorado; Regional Haze Plan for the Second Implementation Period, 91 Fed. Reg. 3,048, 3,049, fn. 9 (Jan. 26, 2026); EPA, *EPA Approved Statues and Regulations in the Colorado SIP* (Jan. 6, 2026); 83 Fed. Reg. 31,332 (July 5, 2018).

[295] Craig Station is a major source and Craig Unit 1, by volume of pollution emitted, is itself a major source. Exhibit B at 27; Exhibit KK (Division, *Operating Permit No. 96OPMF155* (July 1, 2021));

[296] *See* Exhibit KK; 42 U.S.C. § 7661a(a).

[297] *See* Exhibit KK, at 25.

[298] *See* § 25-7-105(1)(e), Colo. Rev. Stat.; Exhibit B, ¶ 29; § 25-7-102(2)(g), Colo. Rev. Stat.

Thus, by ordering the Craig Station owners to return Craig Unit 1 to service and to be available to operate beyond the December 31, 2025 closure date, the Order directs the owners to violate both state and federal law and is subject to the requirements of Section 202(c)(2).

b. The Order does not comply with Section 202(c)(2).

Because the Order conflicts with state and federal environmental laws, the Department was required to ensure that the Order: 1) " requires generation, delivery, interchange, or transmission of electric energy *only* during hours necessary to meet the emergency and serve the public interest," 2) "to the maximum extent practicable, is consistent with any applicable Federal, State, or local environmental law or regulation," and 3) "minimizes any adverse environmental impacts."[299] The Department's Order contains no conditions or instructions that meet these requirements.

First, by referring to the "hours" necessary to meet the emergency, Congress placed a high burden on the Department to demonstrate that the remedy provided in a Section 202(c) order is narrowly tailored to the specifics of the emergency that the order is designed to address. Even if the Department had identified a true emergency (which it has not), the FPA authorizes the Department to compel generation only when an emergency shortage of electric energy would occur absent operation of Craig Unit 1 specifically.[300] The Order's terms fail to require operation "only during the

---

[299] 16 U.S.C § 824a(c)(2) (emphasis added).
[300] *Id.*; *see, e.g.*, Department, <u>Order No. 202-17-4</u>, <u>*Summary of Findings*</u> (Sept. 14, 2017), at 9 ("authorizing operation of" units subject to emergency order "only when called upon . . . for reliability purposes," according to "dispatch methodology" approved by Department).

hours necessary to meet the emergency" described by the Order and violates Section 202(c)(2) because the Order does not establish any limited hours or other parameters for Craig Unit 1 to follow.

The Order also contains no limitation on how SPP West and WACM may call on Craig Unit 1. By leaving the dispatch of Craig Unit 1 entirely in the hands of these entities, the Department is failing to properly limit operation as required by Section 202(c). Without a clearly defined emergency, WACM and SPP West have no standards to determine under what circumstances they should "require the continued operation of Craig Unit 1." The premise for such continued operation is the energy "emergency" articulated in the Order, but it is impossible to know what conditions require Craig Unit 1 to operate by reading the Order.[301] Orders issued by the Department prior to 2025 demonstrate that the Department is capable of including appropriate limiting conditions in Section 202(c) orders. For example, in 2022, the Department issued an order in response to periods of extreme heat, drought conditions, and threat of wildfires that were expected to occur over several days and threaten the reliable operation of the bulk electric power system in California. That order directed the Balancing Authority of Northern California to dispatch specific units only "under the following conditions: the issuance and continuance of an Energy Emergency Alert Level[ ] 2 condition or greater between the hours of 14:00 Pacific Time and 22:00

---

[301] Indeed, the Order contains confusing and contradictory instructions regarding the unit's operations, stating both that "Craig Unit 1 shall not be considered a capacity resource" and that its "continuous operation" is required. Exhibit A, at 1, ¶ G. Presumably, this means that the unit may only be called up by WAPA or SPP when there is an actual supply shortage that existing resources cannot meet. But if that is the intent, it is not clear from the face of the Order.

Pacific Time after exhausting all reasonably and practically available resources."[302] Although Section 202(c)(2) requires the Department to include limiting conditions in the Craig Unit 1 Order as well, it chose not to, and that choice is contrary to law.

Second, Section 202(c)(2) requires that where an order may result in a conflict with environmental law or regulation, it must "to the maximum extent practicable, [be] consistent with any applicable Federal, State or local environmental laws." The Order contains no analysis of the plant's environmental obligations and no operational criteria established to minimize impacts. The Order merely states that "operations of Craig Unit 1 must comply with applicable environmental requirements to the . . . . extent feasible while operating consistently with emergency conditions."[303]

There are numerous environmental requirements that are affected by the continued operation of the Craig Unit 1 facility, but the Department failed to identify mechanisms to allow Craig Unit 1 to remain available while minimizing conflicts with these requirements. The Department also did not consult with the State of Colorado, including its environmental regulators, who could have advised on ways to minimize impacts.[304] The Order does not reference or discuss the applicable environmental laws

---

[302] Department, Order No. 202-22-2 (Sept. 4, 2002) at 4; *see also Letter from Kevin Kolevar, Director, Office of Electricity Delivery and Energy Reliability to Robert Driscoll, CEO, Mirant Mid-Atlantic, LLC* (May 31, 2007) (Letter from DOE describing the emissions limitations that a utility should follow when complying with a 202(c) order.); Department, Order No. 202-17-1 (Apr. 14, 2017) (202(c) Order from DOE instructing SPP to adopt a temporary operating guide and comply with additional operating requirements set out in an EPA compliance order).

[303] Exhibit A, ¶ C.

[304] Exhibit B, ¶¶ 10, 32-34; *see also* Section 103 of the Department of Energy Organization Act, 42 U.S.C. § 7113 (requiring the Department to give due consideration to the needs of states when proposing any action that conflicts with a state energy plan, and to attempt to resolve conflicts through consultations with appropriate state officials). The Order plainly conflicts with Tri-State's decision-making process, the CoPUC's approved ERPs, the EPA-approved Regional Haze SIP, and AQCC regulation.

and regulations impacted by the Order, revealing the Department's failure to analyze these requirements to ensure compliance with environmental standards.

In particular, the Order fails to reflect any consideration of interactions with the Federal Clean Air Act Regional Haze program[305] or National Ambient Air Quality Standards ("NAAQS") attainment and permitting programs. The Regional Haze program requires states to reduce emissions of NOx, $SO_2$, and PM from sources that affect Class I federally protected areas.[306] States must conduct detailed and expensive analyses, and based on the results of those analyses, impose federally enforceable controls and emission limits upon the largest and most impactful sources of haze pollutants.[307] The Federal Clean Air Act, through the NAAQS attainment and permitting programs, also directs states to achieve and maintain air quality standards for certain pollutants, including NOx, $SO_2$, and PM.[308] The Department does not appear to have conducted any analysis of the impact keeping Craig Unit 1 operational may have on sources' and Colorado's ability to comply with either of these programs. The Order gives no guidance as to whether it creates conflicts with either of these requirements and, if it does, on how to navigate them.

---

[305] EPA recently disapproved Colorado's Regional Haze Plan for Round 2 (which does not involve Craig Unit 1) by, in part, pointing to this Order. 91 Fed. Reg. at 3,049, fn. 9 (Jan. 26, 2026). While Colorado maintains that EPA's action was improper, and that its Regional Haze SIP currently meets federal requirements, it does reveal that EPA considers Craig Unit 1 relevant to Colorado's compliance with Regional Haze requirements now and in the future. The federal government must, but fails to, take a consistent position in the Regional Haze SIP disapproval and the Order as it relates to Craig Unit 1.

[306] *See* 42 U.S.C. §§ 7491, 7492; *see also* implementing regulations at 40 C.F.R. § 51.300-309.

[307] *Id.*

[308] *See, e.g.,* 42 U.S.C. §§ 7409, 7410.

Accordingly, the Order violates the Department's statutory obligation to "ensure" the maximum feasible compliance with applicable environmental standards.[309] This obligation requires the Department to offer some discrete guidance as to the unit's operations, rather than merely parroting the statutory text. This lack of detail also makes it impossible for Colorado's environmental regulators to know what operational activities are excused from environmental compliance by the Order, increasing the complexity and burdens associated with any state enforcement actions.

Third, Section 202(c)(2) requires the Department to minimize the adverse environmental impacts of the Order, which the Order fails to do. This mandate is textually and substantively distinct from the Department's (also unfulfilled) obligation to ensure maximum practicable compliance with environmental standards. By failing to include a sufficient or legal description of the purported emergency, this Order authorizes Unit 1 to generate electricity and pollute beyond any emergency needs, thereby increasing the environmental impacts that by law the Order must minimize. When Craig Unit 1 operates, it emits NOx, $SO_2$, fine PM, GHG emissions, HAPs, and other harmful pollutants.[310] The Order includes no measures to mitigate impacts when compliance with environmental standards proves impracticable, even though those types of measures have been routinely included in past orders.[311] At a minimum, the

---

[309] 16 U.S.C. § 824a(c)(2) (emphasis added).
[310] Exhibit B, ¶ 13.
[311] *See, e.g.*, Department, Order No. 202-17-4 (Sept. 14, 2017) at 2 (permitting non-compliant operation only during specified hours, and requiring exhaustion of "all reasonably and practicably available resources," including available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions); Department, Order No. 202-22-4 (Dec. 12, 2022) (requiring "reasonable measures to inform affected communities" of non-compliant operations).

statute requires the Department to include sufficiently detailed reporting obligations to ascertain what impacts result from emergency operations; without such reporting, the Department has no ability to "ensure" that adverse impacts are minimized.[312] The Order here instead merely requires "such additional information" as the Department, in the future, may (or may not) "request[] . . . from time to time." That possibility of future, unspecified information gathering cannot satisfy the statute's demand that the Department "ensure" that its Order minimizes environmental impacts.[313]

Similarly, the Order does not address or assess mechanisms to minimize the pollution from Craig Unit 1 that would or could be associated with its operation in response to the Order. It also does not address or assess the environmental impacts associated with the acquisition and transport of additional coal that may be necessary to facilitate Unit 1's operation, and contains no limitations on the type of coal that may be used so as to minimize the impacts of any new emissions. Not all coal is inherently compatible with the units at the Craig Station, and depending on where new coal is sourced from, there could be significant emissions and costs associated with the distances required to import that coal.[314] Nor are these impacts addressed by the Department's cursory instruction to Tri-State to comply with applicable environmental requirements "to the maximum extent feasible." Because the Department made no attempt to address the requirements of Section 202(c)(2), the Order is unlawful.

---

[312] *See, e.g.,* Department, Order No. 202-24-1 (Oct. 13, 2024) at 4-5 (requiring detailed data on emissions of pollutants).
[313] 16 U.S.C. § 824a(c)(2).
[314] Exhibit B, ¶¶ 32-33.

For these reasons, the Order fails to comply with the Department's obligations under Section 202(c)(2), and should be withdrawn.

**F.      The Order is designed to support the federal administration's policy goal of propping up the coal industry, making it an arbitrary and capricious pretext.**

Agency action is arbitrary and capricious when it rests on a "pretextual" reason that is "incongruent with what the record reveals about the agency's priorities and decision-making process."[315] Agency decisions that feature "unjustifiable bias or partisanship are precisely the types of agency actions that 'would work a violation of the arbitrary-and-capricious standard.'"[316] Here, the record demonstrates that there is no evidence of an energy emergency within the meaning of Section 202(c) that would support issuance of the Order. Instead, the Order is a transparent attempt to favor the Trump administration's preferred energy source and revive the coal industry. Because the Order is pretextual and divorced from any actual emergency, the Order violates the law and must be withdrawn.

   i.      *The Department's 2025 Section 202(c) orders demonstrate a pattern of arbitrary and capricious behavior designed to carry out a policy goal.*

Over the course of 2025, the Department and the President have made clear that they are using Section 202(c) orders to prevent coal-fired generating plants from retiring, simply because the current administration prefers coal and other fossil fuel generation. On his first day in office, the President declared a "National Energy Emergency" and identified coal as one of his preferred energy resources.[317] The President later directed the Department to "streamline" its use of emergency orders,

---

[315] *Dep't of Commerce*, 588 U.S. at 785.
[316] *Level the Playing Field*, 961 F.3d at 464 (quoting *Hagelin v. FEC*, 411 F.3d 237, 242 (D.C. Cir. 2005)).
[317] Exec. Order 14156, 90 Fed. Reg. 8,433, 8,434 (Jan. 20, 2025), Sec. 8(a).

explaining that his goal was to "revitaliz[e] America's big beautiful coal industry to support grid stability and American jobs."[318]

Following these pronouncements, the Department has issued orders for nearly every coal plant scheduled to retire in 2025, all for the statutory maximum of 90 days. None of these orders meet the same criteria as previous orders issued pursuant to Section 202(c). Specifically, none were publicly requested by a utility;[319] none were based on an inability to comply with environmental laws; and none were responsive to or tailored to meet a specific, imminent, unexpected and temporary emergency. The Department Secretary Wright has confirmed that "[t]he goal [of the recent 202(c) orders] is to stop the political closure of coal plants."[320]

For example, the Department's recent order to keep R.M. Schahfer Plant Units 17 and 18 running ignores the fact that Unit 18 was in a forced outage from February 16, 2025 to June 23, 2025, and then again from July 9, 2025 until now. It is unclear how a plant that barely operated throughout 2025 and was not operational at the time the Department issued its Section 202(c) order could help in an alleged emergency. The Schahfer Plant Order also fails to describe an emergency, and in fact actually recognizes that there is anticipated to be a surplus of generation capacity in

---

[318] The White House, *Fact Sheet: President Donald J. Trump Strengthens the Reliability and Security of the United States Electric Grid* (Apr. 8, 2025); *see also* New York Times, Trump Signs Orders Aimed at Reviving a Struggling Coal Industry, April 8, 2025); Exec. Order 14261, Reinvigorating American's Beautiful Clean Coal Industry and Amending Executive Order 14241, 90 Fed. Reg. 15,517 (April 14, 2025); Exec. Order 14260, Protecting American Energy from State Overreach, 90 Fed. Reg. 15,513 (April 14, 2025); Regulatory Relief for Certain Stationary Sources To Promote American Energy, 90 Fed. Reg. 16,777 (April 21, 2025).

[319] It is common practice for the Department to post the request of the entity requesting a specific order within that order's docket. *See, e.g.* Department, *2024 DOE 202(c) Orders*; Department, *2023 DOE 202(c) Orders*.

[320] Department, *Energy Department Convenes First National Coal Council Meeting Under Renewed Charter, Reaffirming Coal's Role in Unleashing American Energy* (Jan. 15, 2026).

MISO's 2025-2026 winter season,[321] revealing that order, like the Order, to be incongruent with the record facts.[322]

Together, these orders demonstrate that, rather than addressing emergencies, the Department is working to prevent the retirement of coal plants across the United States.

    ii.    *Despite claims it is addressing energy emergencies, the Department is simultaneously interfering with efforts to increase generation through renewable resources.*

At the same time the Department is claiming that an energy emergency justifies exercise of its Section 202(c) emergency authority, it is also working to stymie development of renewable generation sources, particularly wind and solar.

The Department's own website explains that "wind energy offers many advantages which explains why it's one of the fastest-growing energy sources in the world[,]"[323] and that solar energy "can support household savings, energy independence, economic opportunities, grid reliability, resilience, security and affordability, and a safer planet."[324] Wind and solar energy are also extremely cost competitive with other energy sources. The most recent Levelized Cost of Energy+ Report ("LCOE Report") found that "[o]n an unsubsidized $/MWh basis, renewable energy remains the most cost-competitive form of generation."[325] Renewables are also important in a high demand scenario, as they are the "quickest-to-deploy

---

[321] Exhibit S, at 3.
[322] *See Dep't of Commerce v. New York*, 588 U.S. at 785.
[323] Department, *Advantages and Challenges of Wind Energy*.
[324] Department, *Solar Energy*.
[325] Lazard LCOE, *Levelized Cost of Energy+* (June 2025), at 4.

generation resources."[326] Colorado has confirmed that wind and solar energy are low cost options to provide reliable electricity generation in the Northwest Colorado region, including Craig.[327]

Despite these advantages, the federal government and the Department have been actively repressing wind, solar, and hydrogen fuel deployment. Alongside the Energy Emergency Executive Order, President Trump issued an executive memorandum ("Memo") directing federal agencies to pause the issuance of all wind energy authorizations.[328] That Memo has since been declared unlawful and vacated.[329] In addition, the One Big Beautiful Bill Act ended subsidies for wind and solar energy projects years earlier than planned.[330] The Department has also cut funding for grants that were supposed to go to projects such as hydrogen technology and upgrades to the electric grid.[331] And although the solar industry installed nearly 18 GW of new

---

[326] *Id.*

[327] *See* Colorado Energy Office, *Exploring Advanced Energy Solutions for Rural Colorado* (Dec. 19, 2025) (study looked at both the levelized cost of energy and the levelized cost of capacity for multiple generation options and found that solar combined with battery storage has the lowest levelized cost of electricity, and wind combined with battery storage has the lowest cost levelized net cost of capacity).

[328] Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8,363 (Jan. 29, 2025).

[329] Judgement Ordered 12/18/2025 in *State of New York v. Trump*, 25-cv-11221-PBS (D. Mass.).

[330] Sidley, *The "One Big Beautiful Bill" Act – Navigating the New Energy Landscape* (Jul. 15, 2025); *see also* 26 U.S.C.A. § 45Y (creating wind production tax credits, passed Aug. 2022); 26 U.S.C.A. § 48E (creating solar investment tax credits, passed Aug. 2022); One Big Beautiful Bill Act, Pub. L. 119-21, Title VII, § 70512-3, 139 Stat 72 (July 4, 2025) (amending 26 U.S.C.A § 45Y and 26 U.S.C.A. § 48E to end subsidies for wind and solar projects).

[331] *See* Walton, R., *DOE cancels $7.6B in clean energy awards in states that voted against Trump* (Oct. 2, 2025); Banse, T., *Trump administration yanks funding for Northwest green hydrogen project* (Oct. 2, 2025); Kaufman, A., *Trump's cuts to billion-dollar hydrogen hubs rattle industry* (Oct. 2025).

capacity in the first half of 2025, the federal administration's efforts to stymy wind and solar energy has resulted in significantly reduced solar deployment.[332]

As the Department has observed, "the reliability of the power grid is intrinsically a system-wide property that cannot be ensured by an individual resource or technology in that system."[333] Focusing on one technology instead of a portfolio of resource adequacy measures increases risk.[334] The Department's current single-minded focus on coal reflects a policy preference as opposed to a desire to address any actual energy emergency, and constitutes an unlawful pretext.

## G.  The Department failed to comply with NEPA.

By requiring Craig Unit 1 to remain available beyond its planned retirement date, the Order has the potential to cause significant environmental impacts and requires evaluation under NEPA.[335] Because the Department has misused its emergency authority in the Order,[336] it cannot rely on the exception to NEPA's implementing procedures that applies to emergency actions. Quite simply, there is no "emergency situation[] that demand[s] immediate action" here.[337] As demonstrated above, there is no current or imminent energy shortfall or near-term reliability emergency that justifies continued operation of Craig Unit 1.[338] Accordingly, to the

---

[332] Wood Mackenzie, *Solar and storage dominate new power additions in first six months of Trump administration as federal policies drive up energy costs* (Sept. 9, 2025); Economy+Environment, *Clean Economy Works: November 2025 Anaysis* (Dec. 12, 2025).
[333] Department, *The Future of Resource Adequacy* (Apr. 2024) at 8.
[334] *Id.*
[335] 42 USC 4336(b), *supra.*
[336] *See* Sections V.A-F, *supra.*
[337] 10 C.F.R. § 1021.103.
[338] *See* Section V.C., *supra.*

extent the Department is relying on the exception for emergency actions to avoid full NEPA analysis, such reliance is contrary to law.

Moreover, the Department's NEPA implementing regulations recognize that where an action has the potential to cause significant impacts on an environmentally sensitive area, such as federally- and state-designated wilderness areas, national parks, scenic areas, and similar resources, the action is not appropriate for categorical exclusion and instead must be analyzed under NEPA.[339] Here, retirement of Craig Unit 1 by December 31, 2025 is a requirement of Colorado's federally approved SIP to address the Federal Clean Air Act visibility program. This program is designed to protect federally-designated areas home to sensitive ecosystems or species potentially harmed by even small increases in pollution.[340] Specifically, the Colorado Regional Haze SIP, which incorporated Craig Unit 1's retirement date in Round 1, is designed to protect national parks and wilderness areas in Colorado including Black Canyon of the Gunnison National Park, Great Sand Dunes National Park, Rocky Mountain National Park, and Mount Zirkel Wilderness Area.[341] Craig Unit 1 is located near the Mount Zirkel Wilderness Area.[342] As a result, the Department's own NEPA regulations dictate that the action was subject to NEPA review.

---

[339] 10 C.F.R. Part 1021, Appx. B, § B(4)(iv).
[340] Exhibit B, ¶ 26.
[341] Exhibit MM (Division, *Colorado Visibility and Regional Haze SIP for the Twelve Mandatory Class I Federal Areas in Colorado* (Dec. 15, 2016)).
[342] 5 Colo. Code Regs. § 1001-5:F.VI. (2014).

In addition to seeking rehearing, the State of Colorado moves the Department for a stay of the Order until the conclusion of judicial review.[343] The Department should also refrain from renewing the Order as currently drafted beyond its current expiration in March 2026. The Department has the authority to issue a stay under the Administrative Procedure Act and should do so where "justice so requires."[344] In deciding whether to grant a request for stay, agencies consider: (1) whether the party requesting the stay will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm other parties; and (3) whether a stay is in the public interest.[345]

Injuries under this standard must be actual, certain, imminent, and beyond remediation.[346] Financial injury is irreparable where no "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation."[347] Environmental injury, however, "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*,

---

[343] 18 C.F.R. § 385.212.

[344] 5 U.S.C. § 705.

[345] *See Nken v. Holder*, 556 U.S. 418, 434, 436 (2009); *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see, e.g., Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,020, at P 41 (2023); *ISO New Eng. Inc.*, 178 FERC ¶ 61,063, at P 13 (2022), *rev'd on other grounds sub nom. In re NTE Conn., LLC*, 26 F.4th 980, 987-88 (D.C. Cir. 2022).

[346] *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *ANR Pipeline Co.*, 91 FERC ¶ 61,252, at p. 61,887 (2000); *City of Tacoma*, 89 FERC ¶ 61,273, at p. 61,795 (1999) (recognizing that, absent a stay, options for "meaningful judicial review would be effectively foreclosed").

[347] *Wis. Gas Co.*, 758 F.2d at 674 (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also In re NTE Conn., LLC*, 26 F.4th at 990-91. (Colorado refuses to concede that its residents, as ratepayers, should bear this cost of the Department's illegal actions here. Nonetheless, we assume that neither the Department nor the Craig Station owners want to bear those costs either, and will seek to impose them on Coloradans.)

irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."[348]

**A.      Colorado and its people will suffer irreparable injury absent a stay.**

Here, a stay is necessary to prevent irreparable harm to the State of Colorado. If Craig Unit 1 is required to operate, it will result in emissions of dangerous air pollutants that would not otherwise have occurred but for the Order. And even requiring Craig 1 to be available to operate, as the Order directs, will increase costs that may be passed on to ratepayers, along with increasing pollution directly through readying activities, and indirectly through the sourcing and transportation of fuel. Even if the unit dispatches rarely or not at all, these excess pollutants contribute to and exacerbate respiratory problems, cardiovascular issues, and other health conditions.[349]

A stay would not result in harm to any other interested parties. The issuance of a stay would not harm end-use electricity consumers because there is no emergency addressed by the operation of Craig Unit 1. The lack of an actual emergency means that a stay would not disrupt the provision of electricity. Furthermore, because Tri-State had already planned for the closure of Craig Unit 1, a stay would have the effect only of relieving Tri-State of the administrative, compliance, and planning burdens imposed by the Order. On the balancing of equities, there is therefore no meaningful countervailing harm that would follow from a stay.

---

[348] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).
[349] Exhibit B, ¶ 21.

**B.**     **A stay is in the public interest.**

There is no public interest served by the Order, and a stay will only benefit the public. First, the Order exceeds the Department's authority; it has provided no reasonable grounds to substantiate any near-term or imminent shortfall in electricity supply that would necessitate Craig Unit 1's continued operation.[350] Second, a stay would protect the broader public from the costs and additional pollution produced by unnecessary operation of Craig Unit 1.

### VII.     Conclusion

For the reasons set forth above, the State of Colorado respectfully requests that the Department grant intervention; grant a rehearing and rescind the Order; and stay the Order.

Filed on January 28, 2026.

> Submitted by:
> PHILIP J. WEISER
> Attorney General
>
> /s/ *Carrie Noteboom*
> CARRIE NOTEBOOM, #52910*
> Assistant Deputy Attorney General
> GABRIELLE FALCON, #56739*
> Assistant Attorney General
> ROBYN L. WILLE, #40915*
> First Assistant Attorney General
> JESSICA L. LOWREY, #45158*
> First Assistant Attorney General
> SARAH F. QUIGLEY, #56686*
> Assistant Attorney General
> PHALEN KOHLRUSS-REUMAN, #57975*
> Assistant Attorney General

---

[350] *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting that "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

Patrick Witterschein, #58184*
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: 720-508-6000
E-mail: carrie.noteboom@coag.gov
      gabby.falcon@coag.gov
      robyn.wille@coag.gov
      jessica.lowrey@coag.gov
      sarah.quigley@coag.gov
      Phalen.Kohlruss@coag.gov
      Patrick.Witterschein@coag.gov

*Counsel of Record

## Certificate of Service

This is to certify that I have duly served the foregoing, **The State Of Colorado's Request For Rehearing, Motion to Intervene, and Stay Request**, upon all parties below electronically via e-mail this 28th day of January, 2026:

Department of Energy:
OHA.filings@hq.doe.gov

WAPA:
SOCChiefComplianceOffice@wapa.gov
klinefelter@wapa.gov

Tri-State Generation and Transmission Assoc.:
liz.stevens@tristategt.org
Dietrich.Hoefner@wbd-us.com
sarah.ruen@tristategt.org
Jay.sturhahn@tristategt.org
Tyler.N.Smith@xcelenergy.com
lisa.tiffin@tristategt.org

Public Service:
mlarson@wbklaw.com
Matt.b.harris@xcelenergy.com

SPP:
psuskie@spp.org
tkentner@spp.org
cnolen@spp.org

Salt River Project:
Michael.OConnor@srpnet.com

PacifiCorp:
marie.durrant@pacificorp.com

Platte River Power Authority:
leonards@prpa.org
camachoj@prpa.org

/s/ *Kacey Higgerson*
Kacey Higgerson
Senior Paralegal
Sarah King-Cash
Senior Paralegal
Kacey.Higgerson@coag.gov
Sarah.King-Cash@coag.gov

## State of Colorado's Exhibit List

| Exhibit No. | Document Description |
|---|---|
| A | Department, Order No. 202-25-14 (Dec. 30, 2025) |
| B | Declaration of Josh Korth Declaration (Jan. 26, 2025) |
| C | Declaration of Erin O'Neil (Jan. 26, 2025) |
| D | Declaration of Joseph Pereira (Jan. 23, 2025) |
| E | CoPUC, Decision No. C25-0612, issued on August 26, 2025, in Proceeding No. 23A-0585E. |
| F | CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Brad Nebergall, filed on December 1, 2020, in Proceeding No. 20A-0528E, Attachment BN-2 (Tri-State, *2020 IRP/ERP,* Public (Dec. 1, 2020) |
| G | CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Brad Nebergall, filed on December 1, 2020, in Proceeding No. 20A-0528E, Attachment BN-1 (Tri-State, *Responsible Energy Plan* (Jan. 2020) |
| H | Salt River Project, *2023 Integrated Systems Plan* |
| I | Department, Order No. 202-25-7 (Aug. 20, 2025) |
| J | CoPUC, 120 Day ERP Implementation Report, Public, filed on April 11, 2025, in Proceeding No. 23A-0585E |
| K | NERC, *2024 Long-Term Reliability Assessment* (Dec. 2024) |
| L | NERC, *2025-2026 Winter Reliability Assessment* (Nov. 2025) |
| M | Department, *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid* (July 2025) |
| N | Motion to Intervene and Protective Request for Rehearing by the Attorneys General of Maryland, Washington, Illinois, Michigan, Minnesota, Arizona, Colorado, Connecticut, and New York, filed on August 6, 2025 with the Department |
| O | Department, Order No. 202-25-3 (May 23, 2025) |
| P | Department, Order 202-25-4 (May 30, 2025) |
| Q | Department, Order No. 202-25-11 (Dec. 16, 2025) |
| R | Department, Order No. 202-25-13 (Dec. 23, 2025) |
| S | Department, Order No. 202-25-12 (Dec. 23, 2025) |
| T | Congressional Research Service, *Federal Power Act: The Department of Energy's Emergency Authority* (June 12, 2025) |
| U | Department, Order 202-25-9 (Nov. 18, 2025) |
| V | Department, Order No. 202-25-8 (Aug. 28, 2025) |
| W | CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Lisa K. Tiffin, Rev. 1, filed on May 15, 2024, in Proceeding No. 23A-0585E |
| X | CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Lisa K. Tiffin, Rev. 1, filed on May 15, 2024, in Proceeding No. 23A-0585E, Attachment LKT-1 (Tri-State, 2023 ERP Phase I, Rev. 2 (Apr. 22, 2024) |

| Y | CoPUC, *Verified Petition of Trial Staff of the Commission, CEO, UCA, and Public Service for a Variance from Decision No. C18-0761 and Any Other Requirements, Request for Shortened Notice and Intervention Period, and Request for Approval of Associated Procedures,* filed on November 10, 2025, in Proceeding No. 25V-0480E |
|---|---|
| Z | CoPUC, Tri-State, *2025 Annual Progress Report*, filed on December 1, 2025, in Proceeding No. 23A-0585E |
| AA | CoPUC, Decision No. R24-0602, issued on August 22, 2024, in Proceeding No. 23A-0585E |
| BB | CoPUC, Decision No. C25-0892, issued on December 10, 2020, in Proceeding No. 25V-0480E |
| CC | CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Lisa K. Tiffin, Rev. 1, filed on May 15, 2024, in Proceeding No. 23A-0585E, Attachment LKT-1-Attachment F (*Electric Energy and Demand Forecast*, Public) |
| DD | CoPUC, Hrg. Ex. 103, Direct Testimony and Attachments of Brian L. Thompson, Rev. 1, filed on May 24, 2024, in Proceeding No. 23A-0585E |
| EE | PRPA, *2024 Integrated Resource Plan* (Apr. 2023) |
| FF | PRPA, *Craig Units 1&2 (Yampa Project)* (2026) |
| GG | PacifiCorp, *Utah Integrated Resource Plan Volume* I (Mar. 31, 2025) |
| HH | SPP, *SPP Reliability Plan* (Jun 2, 2025) |
| II | NERC, *Emergency Operations* |
| JJ | CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Brad Nebergall, filed on December 1, 2020, in Proceeding No. 20A-0528E, Proceeding 20A-0528E |
| KK | Division, *Operating Permit No. 96OPMF155* (July 1, 2021) |
| LL | Division, *Technical Review Document for Operating Permit 96OPMF155* (Jan. 2005) |
| MM | Tri-State, *General APEN- Form APCD-200* (Apr. 21, 2025) |
| NN | Division, *Colorado Visibility and Regional Haze SIP for the Twelve Mandatory Class I Federal Areas in Colorado* (Dec. 15, 2016) |
| OO | CoPUC, Hrg. Ex. 101, Direct Testimony and Attachments of Lisa K. Tiffin, Rev. 1, filed on May 15, 2024, in Proceeding No. 23A-0585E, Attachment LKT-1 – Attachment G-1 (Astrape Consulting, *Reserve Margin and Effective Load Carrying Capability (ELCC) Study,* Public (Aug. 2, 2023) |
| PP | Department, Order No. 202-25-10 (Nov. 25, 2025) |
| QQ | Tri-State, *U.S. DOE Orders TriState to Keep Craig Generating Station Unit Operating for Next 90 Days* (Dec. 31, 2025) |
| RR | Powell, R., *1 coal plant open amid order* (Jan. 6, 2026) |
| SS | Behr, P., *PJM to ratchet down projected AI power demand for eastern US* (Jan. 6 , 2026) |